[Civ. No. 22358.   Second Dist., Div. Three.   Dec. 27, 1957.]

ALICE WILDING, Appellant, v. WILLIAM W. NORTON et al., Respondents.

. Alfred Lubin and Gertrude LaVoie Elliott for Appellant.

Chase, Rotchford, Downen & Drukker, Donn B. Downen, Jr., and Otto M. Kaus for Respondents.

SHINN, P. J.—Plaintiff appeals from an adverse judgment after verdict in an action arising out of a collision of automobiles.

Orange Grove Avenue in South Pasadena extends north and south. It intersects Monterey Road at right angles. North of Monterey, Orange Grove is 30 feet wide; to the south 36 feet wide. Monterey is 36 feet wide. On September 3, 1953, plaintiff Wilding was a passenger in a Cadillac driven by her brother, Omer LaVoie. Coming from the west on Monterey it collided in the intersection with a Ford truck owned by defendants Clayton Butler and Vernon Chadwick and driven by defendant Norton. The truck had come up Orange Grove from the south, had stopped at a boulevard stop sign at the southeast corner of the intersection, entered onto Monterey and it came into collision with the LaVoie car near the middle of the intersection. Plaintiff being a passenger in her brother's car, the factual questions were whether Norton was guilty of negligence and whether plaintiff was guilty of contributory negligence. Manifestly, negligence was a proximate cause of the collision.

The streets in the immediate locality are comparatively level. Some 200 feet west of Orange Grove, Monterey makes an easy turn to the south and slopes downward toward the west. From the point where Norton stopped at the stop sign he had an unobstructed view along Monterey to the west of at least 200 feet. There was no other traffic to obstruct vision and LaVoie had a clear view of the intersection as he came around the curve. The streets were dry, the weather was clear and the collision was one of those intersection accidents that occur only through the negligence of one or both of the drivers. With respect to the conduct of Norton the question was whether he should have yielded the right of way to the other car. The evidence as to the conduct of LaVoie was centered upon the speed of his car. It was stipulated that the area was in a 25-mile speed zone. There were such warning signs, one of them at the intersection. LaVoie testified he was travelling 25 miles per hour and immediately applied his brakes when he saw the truck entering the intersection. Expert testimony based upon the skid marks of his car and the force of the collision was that he was travelling

about 34 mile per hour. Don Moffet, a witness for defendants, testified that he was driving a small truck south on Orange Grove and that when he was about 130 feet north of Monterey he looked to the right and saw the LaVoie car coming around the curve at 50 miles per hour. Another witness, Everett Huff, who lived at the southeast corner of the intersection testified on behalf of plaintiff that it was not possible for one on Orange Grove, north of Monterey, to see westerly to the curve on Monterey until he reached a point 16 feet north of Monterey; there were houses along the west side of Monterey and a house and a hedge at the northwest corner which restricted the view. The photographs in evidence depict this condition. It is contended in the brief of defendants that Huff admitted on cross-examination that the curve could be seen from points farther north, but this is a misstatement of the record. The witness did not so testify. However there was substantial evidence that the LaVoie car was travelling at considerably more than 25 miles per hour. There was also ample evidence to have warranted the jury in concluding that Norton was guilty of negligence in entering the intersection in a manner which made a collision almost inevitable. He testified that before entering the intersection he looked to the left and saw no traffic approaching. He looked to the right, heard the screeching of brakes, looked to his left and saw the LaVoie car within 15 feet of him. He judged its speed to be around 40 miles per hour. It was a reasonable inference that when he entered the intersection the LaVoie car was within his view. We doubt that the verdict was based upon a conclusion of the jury that Norton was free from negligence.

A more logical basis for the verdict would be a conclusion by the jury that Mrs. Wilding was guilty of contributory negligence. She was 46 years of age; she did not drive a car; she was inexperienced in estimating the speed of automobiles; she did not look at the speedometer of the LaVoie car. After the collision she was taken in an ambulance to a hospital and into the hospital in a wheel chair. She was questioned by an officer as to the speed of the LeVoie car and answered "not very fast" and when asked, as she testified, insistently, what she meant she said "approximately 40 miles per hour." Upon cross-examination she was asked whether she "consented" to the speed of the car and answered that she did, but that the car was not travelling fast. Defendants relied upon these answers as proof that she was guilty of contributory negligence.

In line with this contention defendants requested and the court gave an instruction reading: "If you should find from the evidence that the car in which plaintiff was riding was being operated at and immediately prior to the collision at an excessive rate of speed and that such speed was the proximate cause of the collision and that you further find that the plaintiff knew of and consented to such excessive speed, the plaintiff may not recover, although you should also find that the defendants operated their truck in a negligent manner."

Defendants argued to the trial court, and now argue, that the identical instruction was approved in *Valencia* v. *San Jose Scavenger Co.*, 21 Cal.App.2d 469 [69 P.2d 480]. This is not so. The instructions the court considered predicated contributory negligence upon speed that was "excessive and dangerous," and not merely "excessive." But we do not regard the instructions in the Valencia case as model statements of the law. "Excessive" and "dangerous" are words of loose and uncertain meaning. "Excessive" means "in excess of"; standing alone it requires comparison and raises the question, "in excess of what." It presupposes some limit that has been exceeded.

The court gave an instruction on speed as declared in section 510 of the Vehicle Code, that is to say, as to the duty to drive at a speed that is reasonable and prudent, under the surrounding conditions of traffic and the surface and width of the highway. The instruction also stated that speed in miles per hour, as an isolated fact, is not proof of negligence or the exercise of ordinary care.

"Excessive speed" could have been understood to mean "in excess of a reasonable and prudent speed" or "in excess of 25 miles per hour." The fact was emphasized by defendants that the so-called prima facie speed limit was 25 miles per hour. Captain Blakely of the South Pasadena Police Department read the police report of the accident. The report stated in part "Lawful speed: 25. Maximum safe speed under conditions prevailing: 25." Plaintiff was questioned on cross-examination whether she had not seen the 25 mile per hour sign at the southeast corner of the intersection and denied having seen it. As previously stated LaVoie testified that he was driving at 25 miles per hour.

Under the instructions and the evidence the jury was called upon to determine the speed of the LaVoie car and to compare it with what was deemed to be a reasonable and pru-

dent speed, under the statutory definition, or with the posted speed of 25 miles per hour. There was no instruction as to which standard should be used as a basis for comparison. Whether the one or the other comparison was made, it was error to give the instruction.

We shall discuss the matter first upon the assumption that the jury may have understood that "excessive speed" would be a speed in excess of what was reasonable and prudent. ■ The so-called basic speed law is primarily a regulation of the conduct of the operators of vehicles. They are bound to know the conditions which dictate the speeds at which they can drive with a reasonable degree of safety. They know, or should know, their cars and their own ability to handle them, and especially their ability to come to a stop at different speeds and under different conditions of the surface of the highway. ■ They have a constant duty to observe traffic conditions and cannot plead ignorance as to what speed, under the existing observable conditions, would be reasonable and prudent. ■ The passenger, also, has a duty, but it is not the same as that of the operator. It is merely the duty to exercise ordinary care under the conditions in which he finds himself and which should influence his conduct for his own safety. ■ The passenger cannot be presumed to know everything the operator must know, since his position is quite different. He cannot ignore the speed at which the car is travelling, or the manner in which it is being operated; he must be reasonably alert to conditions which would affect his own safety, but he does not have the absolute duty the operator has to know at what speed the car can be driven with safety.

If the jurors understood "excessive speed" to mean "in excess of a reasonable and prudent speed," they could also have understood that if the operator was guilty of negligence in exceeding the allowable speed, the passenger also was negligent in failing to register an objection. This would have imposed upon the passenger undue responsibility. The operator, having the greater duty, is chargeable with knowledge of conditions that require him to reduce his speed, and yet the passenger may have no knowledge of them and no opportunity to observe them. A speed may be unreasonably high in the light of the knowledge of the operator and yet not recognizable by the passenger as unreasonable, in the exercise of ordinary care. ■ Negligence of the operator with respect to speed is not necessarily negligence of the passenger.

The conduct of the latter must be judged in the light of the conditions in which he acts or fails to act, and in accordance with general principles of negligence. ██ With respect to the passenger's duty in the matter of speed, and the question of contributory negligence, the correct rule would be that if he knew, or in the exercise of ordinary care would have known, that the car was being operated at an unreasonably high or imprudent speed, and voiced no objection, he would be guilty of contributory negligence, and if such negligence contributed proximately in any degree to the accident he could not recover. In the present case there were compelling reasons for a correct and specific instruction. Mrs. Wilding did not drive a car; she had never had occasion to estimate the speed of cars in miles per hour; she did not think the car was travelling fast; she did not see the speedometer, and she evidently had confidence in the ability of LaVoie as a driver. All these matters would properly have been taken into consideration under an instruction which stated that her conduct was to be compared with that of a person of ordinary prudence and caution, situated as she was.

██ We have considered the instruction from what we deem to be the viewpoint of the defendants. Even from that viewpoint we see error in the instruction. We now consider the alternative, namely, whether the jury probably compared the speed of the car with the posted speed of 25 miles per hour. In view of the evidence and the emphasis placed upon the posted speed we do not doubt that the jury regarded any speed above 25 miles per hour as excessive. The statement in the police report "Maximum safe speed under conditions prevailing: 25." could not have failed to make an impression upon the jury. We believe that the presence of signs which create a special speed zone is a factor that is, and should be, given consideration in the judging of the reasonableness of speed in the locality.

In view of the inexperience and lack of knowledge of Mrs. Wilding with respect to speed, her statement that the speed of the car was approximately 40 miles per hour, made upon the insistence of the officer, and when she was in a distraught condition, was but slight evidence of the car's speed and her knowledge of it. Nevertheless it was an admission which was used against her, and the fact that she did not protest the speed was relied upon as evidence of her negligence.

In view of the evidence which was relevant to the question of Norton's negligence and that which was relied upon to prove that plaintiff was negligent, the verdict indicates to

us that the jury found that the speed of the car was somewhat in excess of 25 miles per hour and, due to the instruction as to excessive speed, found plaintiff to have been guilty of contributory negligence in failing to make any complaint.

The mere fact that a car is being driven in excess of the rates shown on signs which mark special zones imposes no duty upon a passenger to insist upon a slower speed, or to leave the car. The error in giving the instruction on "excessive speed" deprived plaintiff of a fair trial and requires a reversal of the judgment.

There is but one other matter urged by plaintiff which deserves mention. Plaintiff's attorney filed an affidavit on motion for a new trial setting forth claimed misconduct by defense counsel in cross-examining a medical witness and in argument to the jury. The court struck out the affidavit on motion. We assume the reason for the order was that the affidavit contained purported statements of a juror after the trial, which were, of course, incompetent, and should not have been included in the affidavit. But there was a matter in the affidavit which deserved serious consideration by the court. We refer to only one incident mentioned in the affidavit, and that is the ridicule heaped upon one of plaintiff's medical witnesses. At the commencement of cross-examination a defense attorney stated: "the only time I recall meeting you in connection with my firm, Dr. Billig, was when we were *defending you.*" That this was a deliberate attempt to belittle the witness and cast doubt upon his professional ability was made evident during the argument to the jury in which the same attorney said of the witness, "I wouldn't have him treat my dog" and referred to him as "an odd-ball" and in other like terms. It is unnecessary to pass upon this assignment of misconduct as a ground for reversal of the judgment, or to comment upon it. We mention it only to say that if upon a retrial there should be a repetition of such conduct it should not go unnoticed by the court.

The order denying motion for a new trial being nonappealable the purported appeal therefrom is dismissed. The judgment is reversed.

Wood (Parker), J., and Vallée, J., concurred.

A petition for a rehearing was denied January 22, 1958, and respondents' petition for a hearing by the Supreme Court was denied February 19, 1958. Schauer, J., Spence, J., and McComb, J., were of the opinion that the petition should be granted.