[No. B022306. Second Dist., Div. Five. Feb. 23, 1989.]

HEIDI VON BELTZ, Plaintiff and Appellant, v.
STUNTMAN, INC., et al., Defendants and Appellants.

1470

**COUNSEL**

Belli & Sabih, David S. Sabih and Leonard Sacks for Plaintiff and Appellant.

Waters, McCluskey & Boehle, Fritz Hax, Greines, Martin, Stein & Richland, Irving H. Greines, Alan G. Martin, Pamela Victorine, Pamela Dunn, Daniels, Baratta & Fine, John P. Daniels, James I. Montgomery, Jr., and Judith A. Oljey for Defendants and Appellants.

**OPINION**

**BOREN, J.—**

## I. INTRODUCTION

 Does a movie stuntperson assume the risk of injury by performing a movie stunt? Is a stuntperson who fails to employ a seat belt

during an automobile stunt contributorily negligent? These are the two principal questions addressed in this appeal.

Motion pictures remain one of the premier forms of entertainment in today's world. Movies frequently entertain through flights of fantastic adventure, heavily laden with excitement and danger. Motion picture producers and directors are often able to achieve such results by employing tricks of the trade (e.g., animation, trick photography, special effects, and clever splicing and editing). Some producers and directors, on the other hand, resort to photographing adventuresome activities which are nearly as dangerous as they appear on screen and which sometimes imperil those in front of and behind the camera.

The motion picture industry has long employed seemingly fearless and hardy stuntpersons to perform activities too hazardous for professional actors to undertake. Frequently, these stuntpersons achieve spectacular results without injury. Other times, as here, adventure becomes misadventure.

Plaintiff sued defendants Hal Needham (Needham) and Stuntman, Inc. (Stuntman) for catastrophic injuries she received when an automobile in which she was riding collided with a van during the filming of the movie "Cannonball Run." The vehicle in which plaintiff was riding had no seat belts. The jury assessed the injury as worth $7 million. It found both defendants liable in negligence but also found plaintiff contributorily negligent to the extent of 35 percent. The trial judge offset the damages by plaintiff's 35 percent contributory negligence and by amounts previously awarded under settlements with other defendants not party to this action (e.g., Cannonball Productions, Inc.) and gave judgment to plaintiff in the amount of $0.00. All three parties have appealed. We affirm the judgment.

## II. FACTS

Needham, himself a former movie stuntperson, is a motion picture director. He was the president and sole shareholder of Stuntman, a so-called "loan-out" company which contracted out Needham's services as a director. Stuntman's only employee beside Needham was his secretary. Plaintiff is a young woman, who, prior to her injuries, was not only a stuntwoman but an aspiring movie actress and ski instructor. Her professional stunt experience included driving a stunt car in another Needham film, "Smokey and the Bandit II."

Needham, acting on behalf of Stuntman (and thus, of course, himself) contracted with North Shore Investments to make a movie entitled "Can-

nonball Run." Other financial interests were brought in and Cannonball Productions, Inc. (Cannonball) was formed as the company to produce the movie. Needham became the film's director. Plaintiff was one of several persons hired by Cannonball as stuntpersons for the movie.

Filming began in Los Angeles about three to four weeks before the accident, then went on location in Georgia and Florida. The location had shifted to a desert area near Las Vegas when the accident occurred on June 25, 1980. On that date, plaintiff was assigned to be the passenger in a 1962 Aston-Martin sports car, which car was the double of another Aston-Martin used elsewhere in the film. The Aston-Martin used in the stunt, a vintage automobile, had no seat belts.[1]

When the sports car was delivered to the movie set, the stunt driver, James Nickerson, found it had defective steering, bald tires, and a malfunctioning clutch. Another car had to push it to get it started and then it would not surpass eight miles per hour. Needham had to delay filming of the stunt while the car was repaired. Whether or not the vehicle was in fact fully repaired was disputed at trial. Nickerson also informed Needham about the lack of seat belts and requested that seat belts be installed. They were not. After some repairs, Nickerson and stunt coordinator Bobby Bass gave it a test drive.

What may be referred to as the stunt was actually the second of two "takes." Plaintiff, as passenger, was to assist a special effects man who was to operate a smoke machine placed behind the car's bucket seats. She was not included in the conversations Needham held with the stunt drivers when he discussed his plans for the stunt.[2]

In the first take, the driver, Nickerson, drove the Aston-Martin southbound on a highway so as to encounter five northbound cars driven by other stunt drivers. One of these cars was the Ford van with which the Aston-Martin collided in the second take. In the first take, the Aston-Martin, as planned, cut across the front of this opposing traffic and onto the opposite shoulder, passed the oncoming cars, and then returned to the highway, continuing south. The camera operators were using their lenses to create the illusion that the vehicles were passing closer together than they actually were. This maneuver was performed without incident and plaintiff thought the sports car operated perfectly.

---

[1] The other Aston-Martin, which was not involved in the accident here, is referred to as the "original James Bond car" used in "James Bond" movies and was equipped with special features such as machine guns. As it happens, it was also equipped with seat belts.

[2] The record does not indicate that plaintiff was aware that Nickerson had requested installation of seat belts or that the request was not complied with. The record also does not indicate that the failure to install the seat belts was deliberate.

Dissatisfied with the effect filmed in the first take, Needham decided to try again. The second take began about 30 minutes after the first one had ended. Before the second take began, Needham told the stunt drivers to "pick . . . up" the pace. Needham wanted the Aston-Martin to weave in and out of the oncoming cars in serpentine fashion. He also told Nickerson to double the speed. An escape route was planned which required Nickerson to turn to the right. No one informed plaintiff that the second take would be different from the first stunt maneuver. During this second take, the Aston-Martin traveled at approximately 50 miles per hour. Nickerson saw that a collision with the Ford van was imminent but was unable either to take the escape route or to avoid collision with the van. As the result of the collision, both Nickerson and plaintiff were hospitalized. Plaintiff was permanently and totally paralyzed from the neck down.

Evidence was also presented that, by custom, stuntpersons have ultimate control over their stunts, provide their own safety equipment, and are paid "stunt adjustments," which are negotiated after the stunt and are based on the stunt's degree of hazard. Stuntpersons may refuse to perform a stunt or may require the stunt coordinator, assistant director or production manager to make safety equipment available. Evidence indicated, however, that, if a stuntperson refused or hesitated to participate in a stunt, his or her employment on the movie might be terminated.

On the "Cannonball Run" set were 10 extra seat belts which could be installed upon request. Other "Cannonball Run" stuntpersons had even ordered "five-point" safety harnesses installed in vehicles already equipped with ordinary seat belts before proceeding with driving stunts in the movie. There was testimony that seat belts or harnesses could have been installed within 20 minutes.

Plaintiff's expert testified that if plaintiff had been wearing a lap-shoulder belt at the time of the collision, her injuries would have been no more than fractured ribs.

III. ASSUMPTION OF RISK

■ Needham contends in his cross-appeal that he is not liable to plaintiff because, by performing in a movie stunt, she assumed the risk of being injured. We reject Needham's contention.

■ In *Li* v. *Yellow Cab Co.* (1975) 13 Cal.3d 804 [119 Cal.Rptr. 858, 532 P.2d 1226, 78 A.L.R.3d 393], the California Supreme Court abolished the "all-or-nothing" rule of contributory negligence and replaced it with a system of comparative negligence. In so doing, the Supreme Court also

abolished the defense of assumption of risk "to the extent that it is merely a variant of the former doctrine of contributory negligence," in which case the defense is "to be subsumed under the general process of assessing liability in proportion to negligence." (*Id*. at pp. 828-829.) ██ ██ ██ ██ ██ ██ In determining to what extent assumption of risk has survived the *Li* decision, commentators have generally analyzed the defense by subdividing it into three categories: (1) express assumption of risk,[3] (2) unreasonable implied assumption of risk,[4] and (3) reasonable implied assumption of risk. (*Gonzalez* v. *Garcia, supra,* 75 Cal.App.3d 874, 878.)

██ It is the third variety of the defense, reasonable implied assumption of risk, which is at issue here. It arises when the plaintiff's reasonable conduct in encountering a known danger raises the inference that he has agreed to relieve the defendant of his duty of care. (*Ordway* v. *Superior Court* (1988) 198 Cal.App.3d 98, 102 [243 Cal.Rptr. 536].) ██ However, the question of the post-*Li* viability of reasonable implied assumption risk has not produced a uniform answer. In *Segoviano* v. *Housing Authority* (1983) 143 Cal.App.3d 162 [191 Cal.Rptr. 578], the court answered that reasonable implied assumption of risk has been abolished by the Supreme Court in the *Li* decision and no longer constitutes a complete defense (i.e., one which bars a plaintiff's recovery). (*Segoviano* v. *Housing Authority, supra,* at pp. 169-175.) In *Segoviano,* the plaintiff played in a flag football game sponsored by the defendant and was injured when, in violation of the rules, an opposing player, who was also defendant's recreational coordinator, pushed plaintiff out of bounds. (*Segoviano* v. *Housing Authority, supra,* at p. 165.) The plaintiff testified that he had known such rules violations occurred and sometimes caused injuries during flag football games. (*Ibid*.)

Rejecting the *Segoviano* court's analysis of reasonable implied assumption of risk, the court in *Ordway* v. *Superior Court, supra,* 198 Cal.App.3d 98, answered that this defense "remains viable and, where applicable, provides a complete defense to a cause of action for personal injuries." (*Id*. at p. 107.) We believe that the appellate court in *Ordway* correctly analyzed the issue when it stated that: "The doctrine of reasonable assumption of risk is only another way of stating that the defendant's duty of care has been reduced in proportion to the hazards attendant to the event. Where no duty of care is

---

[3] Without question, express assumption of risk has survived as a complete defense which bars a plaintiff's recovery. This form of the defense applies where the injured party had signed a written contract or other writing waiving all risks, thus relieving the defendant of his duty of care. (See *Li* v. *Yellow Cab Co., supra,* 13 Cal.3d at p. 825, and *Coates* v. *Newhall Land & Farming, Inc.* (1987) 191 Cal.App.3d 1, 8-10 [236 Cal.Rptr. 181].)

[4] The defense of unreasonable implied assumption of risk arises when a plaintiff carelessly or negligently chooses to encounter a known risk. (*Li* v. *Yellow Cab Co., supra,* at p. 826; *Gonzalez* v. *Garcia* (1977) 75 Cal.App.3d 874, 880-881 [142 Cal.Rptr. 503].) Even after *Li,* a plaintiff who unreasonably assumes the risk is not barred from recovery. (*Ibid*.)

owed with respect to a particular mishap, there can be no breach; consequently, as a matter of law, a personal injury plaintiff who has voluntarily—and reasonably—assumed the risk cannot prevail. Or stated another way, the individual who knowingly and voluntarily assumes the risk, whether for recreational enjoyment, economic reward or some similar purpose, is deemed to have agreed to reduce the defendant's duty of care." (*Id.* at p. 104.)

The *Segoviano* court's conclusion that only express assumption of risk survived *Li* depends upon a seemingly ambiguous phrase in the *Li* opinion. The Supreme Court stated that certain assumption of risk situations do not involve contributory negligence and thus are not subsumed in comparative negligence determinations. The Supreme Court gave as an example the situation "where the plaintiff is *held to agree* to relieve defendant of an obligation of reasonable conduct toward him." (*Li* v. *Yellow Cab Co., supra,* 13 Cal.3d 804, 824-825, italics added.) The *Segoviano* court interpreted the "held to agree" language in *Li* to mean "expressly agree" only and thus found that only express assumption of risk had survived *Li*. (*Segoviano* v. *Housing Authority, supra,* 143 Cal.App.3d 162, 167-168.)

This interpretation of the Supreme Court's meaning does not withstand scrutiny. In the *Li* decision, the Supreme Court's "held to agree" language is a direct quotation from the decision in *Grey* v. *Fibreboard Paper Products Co.* (1966) 65 Cal.2d 240, 245-246 [53 Cal.Rptr. 545, 418 P.2d 153]. (*Li* v. *Yellow Cab Co., supra,* 13 Cal.3d 804, 824-825.) The *Grey* decision involved only implied assumption of risk. The question was simply whether the plaintiff's implied agreement to assume the risk was of the unreasonable variety (thus making the defense a variant of contributory negligence, as the Supreme Court in fact found in *Grey*) or was of the reasonable kind (thereby requiring that the jury be instructed on that defense as well as on contributory negligence). (*Grey* v. *Fibreboard Paper Products Co., supra,* at pp. 245-246.) Hence, the "held to agree" language in *Li* does not support the conclusion that the Supreme Court meant to abolish all but the express form of assumption of risk.

■ A separate line of cases has continued after *Li* to follow the so-called "fireman's rule." These cases also hold that *Li* applies only to the *unreasonable* assumption of a known risk, and that a *reasonable* assumption of risk continues to act as a complete defense or bar to liability. (6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 1090, p. 494.) This "fireman's rule" holds that firemen, policemen, and other professionals, such as veterinarians, who engage in hazardous activities in the normal course of their duties, have assumed the risk of known dangers and are thereby barred from recovering for injury. (E.g., *Hubbard* v. *Boelt* (1980) 28 Cal.3d 480 [169

Cal.Rptr. 706, 620 P.2d 156] (policeman injured during high speed chase of a reckless traffic offender); *Walters* v. *Sloan* (1977) 20 Cal.3d 199 [142 Cal.Rptr. 152, 571 P.2d 609] (policeman injured in an attempt to quell a disturbance); *Nelson* v. *Hall* (1985) 165 Cal.App.3d 709 [211 Cal.Rptr. 668] (veterinarian bitten while treating a dog); *Baker* v. *Superior Court* (1982) 129 Cal.App.3d 710 [181 Cal.Rptr. 311] (volunteer firewomen injured by an out-of-control agricultural fire).)

 Needham contends that a stuntperson, such as plaintiff, assumes the risk in exactly the same manner as firemen, policemen and veterinarians. He claims that when plaintiff accepted employment as a stuntperson, she implicitly assumed the risk of injury. However, we need not decide in this case whether, as a matter of law, the fireman's rule applies to movie stuntpersons in general because the facts presented at trial show that plaintiff did not fully know the hazards she faced.

Ordinarily, a movie stunt is not like an athletic contest, a horse race or a fire, where there are spontaneous, opposing and sometimes hostile forces at play. Movie stunts are probably always to some extent planned or choreographed events, although some are better planned or choreographed than others, just as some are more dangerous than others.

A professional stuntperson might be presumed to have expertise or physical agility which minimizes the hazards of a movie stunt. Nonetheless, the stuntperson normally performs a stunt knowing danger has not been entirely eliminated. Where a stuntperson has full awareness of the hazards he faces, it may be possible to conclude that under the circumstances, he has assumed the risk of injury. However, where a movie director or producer changes the nature of the stunt without the stuntperson's knowledge and thereby increases or otherwise alters the risk without the stuntperson's acquiescence, the director or producer may be held liable for any resulting injuries. When in such circumstances a stunt goes awry, the apportionment of negligence will normally be a question for the trier of fact in any ensuing litigation.

In the case of *Lipson* v. *Superior Court* (1982) 31 Cal.3d 362 [182 Cal.Rptr. 629, 644 P.2d 822], a fireman was injured severely when he responded to a chemical boilover at a manufacturing plant. The defendants had informed the fireman that the boilover did not involve toxic chemicals or materials when it in fact did. The Supreme Court held that under the circumstances the fireman had not assumed the risk and was not barred by the fireman's rule. The court stated: "As many other jurisdictions and legal commentators have recognized, a fireman does not assume every possible risk he may encounter while engaged in his occupation. [Citations.] A

fireman assumes only those hazards which are known or can reasonably be anticipated at the site of the fire. [Citations.] . . . [¶] Thus, the principle of assumption of risk, which forms the theoretical basis for the fireman's rule, is not applicable where a fireman's injuries are proximately caused by his being misled as to the nature of the danger to be confronted. [Citation.]." ▪ ▬ ▬ ▪ (*Id.* at p. 371.)[5]

▬ Similarly, the court of appeal in *Nelson* v. *Hall, supra,* 165 Cal.App.3d 709, held that the doctrine "does not mean dog owners could *never* be held liable for injuries to veterinarians or their assistants. We emphasize that the defense of assumption of the risk extends only to the danger which the injured person has *knowingly* assumed; i.e., the danger the dog will bite *while being treated.* [¶] Moreover, if a dog owner purposefully or negligently conceals a particular known hazard from a veterinarian, he or she would not be relieved of liability, for this would expose the injured person to an unknown risk. (See *Lipson* v. *Superior Court, supra,* 31 Cal.3d at p. 371.) This question is not before us, since defendants are not accused of negligence or knowledge of any particular vicious propensity on [the dog's] part." (*Nelson* v. *Hall, supra,* 165 Cal.App.3d 709, 715, fn. 4, italics in original.)

In this case, however, evidence was presented showing that Needham did not inform plaintiff that he was changing the nature of the stunt to be performed. Hence, plaintiff did not know that the stunt would be materially different from the one in which she had participated earlier. Had she known, she could have either declined the stunt or had seat belts installed. Instead, she participated in the stunt not knowing that her driver, Nickerson, was going to drive head-on into opposing traffic, weave through it in serpentine fashion and double the speed utilized in the first performance of the stunt. Certainly, this second stunt presented hazards not evidenced by the first one. Because plaintiff was not informed of the known dangers she was to confront, defendant may not assert the defense of assumption of risk to bar plaintiff's recovery.

## IV. SUFFICIENCY OF EVIDENCE OF CONTRIBUTORY NEGLIGENCE

▬ ▬ Plaintiff contends that the jury's finding that she was 35 percent negligent is based on evidence which is insufficient to support that finding. ▬ In our review of sufficiency of evidence, we must apply the substantial evidence rule and consider the evidence in the light most favor-

---

[5] In applying assumption of risk principles to fireman's rule situations, a failure to warn of a known, hidden danger cannot be distinguished from either a negligent or intentional misrepresentation of the nature of the hazard and results in no different standard of liability. (*Lipson* v. *Superior Court, supra,* 31 Cal.3d 362, 372.)

able to the prevailing parties, giving them the benefit of every reasonable inference and resolving conflicts in support of the judgment. We do not reweigh the evidence. (9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, §§ 278, 281, pp. 289-293; 6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 1103, p. 515.)

Plaintiff relies upon *Segoviano* v. *Housing Authority, supra,* 143 Cal.App.3d 162, 175, and notes that the court of appeal there held that no instruction on contributory negligence was permissible under the facts of that case. However, *Segoviano* provides no support to plaintiff on this issue either since the case is clearly distinguishable. The circumstances in the instant matter bear similarity to those in *Segoviano* in only one pertinent respect: in both cases, the complete defense of assumption of risk has been held not to apply. (See *ante,* Part III.) In *Segoviano,* the plaintiff was not accused of negligence in the manner in which he played the football game. ▇▇▇ But, here, defendants argued that plaintiff was contributorily negligent because she failed to take the safety precaution of using a seat belt in the movie stunt, not simply that her choice to work as a stuntwoman was itself negligence. Thus, plaintiff's analogy to *Segoviano* is of little utility.

We next address plaintiff's assertion that her failure to use a seat belt could not, under the evidence here, constitute contributory negligence.

▇▇▇ It is a matter of common knowledge that seat belts reduce fatalities and minimize injuries in motor vehicle collisions. (*Greyhound Lines, Inc.* v. *Superior Court* (1970) 3 Cal.App.3d 356, 358-359 [83 Cal.Rptr. 343].) It *is* a jury question whether a carrier's failure to provide seat belts amounts to negligence. (*Id.* at p. 360; see also *McNeil* v. *Yellow Cab Co.* (1978) 85 Cal.App.3d 116, 118 [147 Cal.Rptr. 733], holding that a common carrier's failure to provide visible seat belts amounted to negligence.) ▇▇▇ To invoke the so-called "seat belt defense" of contributory negligence, a defendant is required to prove two issues of fact: "(1) [T]he defendant must show whether in the exercise of ordinary care the plaintiff should have used the seat belt which was *available* to him. . . . (2) The defendant must show what the consequence to the plaintiff would have been had seat belts been used." (*Franklin* v. *Gibson* (1982) 138 Cal.App.3d 340, 342-343 [188 Cal.Rptr. 23], italics added.)

▇▇▇ Plaintiff does not dispute that the evidence showed that plaintiff's injuries would have been minimized had seat belts been used. As to the first issue of fact, the evidence showed that plaintiff was hired as a stuntwoman on the film "Cannonball Run." The evidence also showed that she had performed as a stuntwoman in a prior film in which she drove a stunt car. It was also established that a stuntperson is responsible for his or her own

individual safety equipment used to perform a movie stunt and may request additional safety equipment. Other evidence showed that there were 10 seat belts available on the movie location for installation at the request of any stuntperson. During the filming of "Cannonball Run" and prior to the injury-producing stunt, other stuntpersons had successfully ordered five-point safety harnesses installed. It would have taken approximately 15 to 20 minutes to install the seat belts in plaintiff's Aston-Martin. The record also indicates that the use of five-point safety harness is a common precaution taken by movie stunt drivers.

■■■ Considering that a stuntperson is employed normally to perform an act at a minimum dangerous in appearance and at a maximum highly dangerous in fact and given the movie industry custom that stuntpeople may require safety precautions commensurate with the stunt they perform, it appears obvious to us that a stuntperson has responsibility to use whatever appropriate safety equipment is available. ■■■ Even before the first take of the stunt in "Cannonball Run," plaintiff knew there were no seat belts in the sports car in which she was to ride. The evidence also indicates that she could have requested installation of a seat belt. The seat belt was available to her. Hence, clearly sufficient evidence allowed the jury to conclude that plaintiff had not exercised ordinary care when she failed to request a seat belt.

Plaintiff's reliance upon two cases which deal with a contractor's obligation to provide a safe work place for his employees and subcontractors is misplaced. In *Slovick* v. *James I. Barns Constr. Co.* (1956) 142 Cal.App.2d 618 [298 P.2d 923], a contractor was found to have negligently constructed a catwalk which collapsed when the plaintiff walked upon it. In *Johnson* v. *Nicholson* (1958) 159 Cal.App.2d 395 [324 P.2d 307], the plaintiffs were employed to clean an apartment with gasoline. An open flame from a blow torch being used by nearby workers ignited the gasoline killing one man and severely injuring another. In both of these cases, the evidence indicated the injured persons might have taken steps to avoid the injuries. However, the issue was not whether there was substantial evidence of any contributory negligence but rather whether it had been established "as a matter of law," thus barring any recovery under then current tort law. (*Slovick* v. *James I. Barns Constr. Co., supra,* 142 Cal.App.2d 618, 628; *Johnson* v. *Nicholson, supra,* 159 Cal.App.2d 395, 409.) Each of these two cases also indicates that the question of such contributory negligence was one of fact for the jury. (*Slovick* v. *James I. Barns Constr. Co., supra,* 142 Cal.App.2d at p. 628; *Johnson* v. *Nicholson, supra,* 159 Cal.App.2d at p. 410.)

Nor do two cases dealing with an automobile passenger's alleged duty to object to his driver's excessive speed assist plaintiff with her contention. In

*Christensen* v. *Bocian* (1959) 169 Cal.App.2d 223 [336 P.2d 1018], and *Wilding* v. *Norton* (1957) 156 Cal.App.2d 374 [319 P.2d 440], the defendants had apparently prevailed at trial by asserting that the plaintiffs were contributorily negligent because they failed to object to or warn their drivers about excessive speed. Both cases were reversed because in each the trial court's instructions had attributed the driver's negligence to the passenger without any evidence that the passenger knew or in the exercise of ordinary care should have known that the car was being operated at an unreasonably high or imprudent speed. (*Christensen* v. *Bocian, supra,* at pp. 228-229; *Wilding* v. *Norton, supra,* at pp. 380-381.) The vice in each of these two cases was that the jury was asked to impute the driver's knowledge about the speed to the passenger. (*Christensen* v. *Bocian, supra,* at p. 229; *Wilding* v. *Norton, supra,* at p. 380.) In the case at bench, however, plaintiff clearly was aware that the Aston-Martin had no seat belts and had some knowledge that the stunts in which she was about to engage were hazardous. Even under *Christensen* and *Wilding,* cases tried when contributory negligence acted as a complete defense, the circumstances of the instant case presented a jury question of whether plaintiff was contributorily negligent. Substantial evidence supports the jury's finding that she was.

██ Plaintiff's related contention is that even if she was negligent, her negligence was so slight that it does not support the jury's allocation to her of 35 percent liability. She urges that the trial court abused its discretion when it denied her motion for a new trial on that issue. ██ A trial court may grant a new trial order where the jury's apportionment of damages is erroneous and where the order limits the new trial to the issue of apportionment of liability. (*Schelbauer* v. *Butler Manufacturing Co.* (1984) 35 Cal.3d 442, 457 [198 Cal.Rptr. 155, 673 P.2d 743, 38 A.L.R.4th 566].)

██ ██ With no citation to the record, plaintiff essentially maintains that the 35 percent allocation is too high when her conduct is contrasted with that of various other parties involved in the film accident. In her brief, she describes the allegedly negligent activity of various individuals associated with the stunt, but provides us with no citations to the record. Such practice is improper. (*USLIFE Savings & Loan Assn.* v. *National Surety Corp.* (1981) 115 Cal.App.3d 336, 343 [171 Cal.Rptr. 393].)

██ The majority of plaintiff's allegations relate to the negligence of Needham, the director, and Nickerson, the driver of the ill-fated Aston-Martin. Certainly, the jury could not help but consider their negligence in allocating liability in this matter. But plaintiff also characterizes the conduct of other participants in the movie's production as significantly negligent. For example, she points to evidence of the failure of the stunt coordinator, Bobby Bass, and others to supply a defect-free car capable of per-

forming the stunt successfully. This evidence was controverted by conflicting evidence which we must accept as true in resolving the issue. Bobby Bass drove the Aston-Martin in a test drive after it was returned from the repair shop and found that the vehicle performed well. A defense accident reconstruction expert reviewed the films, and his opinion was that the vehicle driven by Nickerson was responsive, steered well and was not defective during the second take until the accident occurred.

The question of apportionment of liability may have been a complex one in this case, but it still was one for the jury. We cannot say, considering all the attendant circumstances concerning negligence of the various parties, that the jury's apportionment was improper or erroneous or that the trial court abused its discretion in denying the motion for a new trial based on that issue.

## V. INSTRUCTION ON CONTRIBUTORY NEGLIGENCE

 Plaintiff further contends that the trial court committed reversible error when it refused to instruct in the language of BAJI No. 3.40. We find no error.

BAJI No. 3.40 is a jury instruction which may be given in cases where an injured party was required to work in a dangerous situation. The rule of this instruction was stated in *Austin* v. *Riverside Portland Cement Co.* (1955) 44 Cal.2d 225, 231 [282 P.2d 69]. The instruction reads: "When a person's lawful employment requires that he work in a dangerous location or a place that involves unusual possibilities of injury, or requires that in the line of his duty he takes risks which ordinarily a reasonably prudent person would avoid, the necessities of such a situation, insofar as they limit the caution that he can take for his own safety, lessen the amount of caution required of him by law in the exercise of ordinary care." The instruction is a correct statement of law. (*Young* v. *Aro Corp.* (1973) 36 Cal.App.3d 240, 244 [111 Cal.Rptr. 535].) However, we do not find that it applies to the case at bench.

The Supreme Court in *Austin* v. *Riverside Portland Cement Co., supra,* 44 Cal.2d 225, embraced the rule embodied in BAJI No. 3.40 for the reason that a person working in a situation of possible danger may have a decreased ability to care for his own safety because " 'of the necessity of his giving attention to his work.' " (*Id.* at p. 239.) In *Austin,* the injured plaintiffs received electrical burns when a crane contacted overhead electric wires. These workers were employed on a "rush" job and were performing at night when the wires were not visible.

In *McDonald* v. *City of Oakland* (1967) 255 Cal.App.2d 816, 820 [63 Cal.Rptr. 593], gaseous fumes built up in a tank, exploded, and killed plaintiff's decedent, who was painting inside the tank. The decedent was alone inside the tank and was wearing an air mask which prevented him from detecting the accumulation of the fumes. In order to avoid the hazard of inhaling the fumes, the decedent had to wear the mask, which prevented him from perceiving the explosive build-up of fumes.

The instruction presented in BAJI No. 3.40 appears aimed at situations where the employment conditions lessen the plaintiff's ability to take precautions. Thus, this court indicated in *Young* v. *Aro Corp., supra,* 36 Cal.App.3d 240, that it was to be applied particularly to those situations where an "employer had *habituated* [the workers] to a particular risk by never acquainting them with the attributes of safe working conditions." (*Id.* at p. 245, italics added.) In *McDonald* v. *City of Oakland, supra,* 255 Cal.App.2d 816, the court, in holding this jury instruction should be given, contrasted it with the principle espoused in *Borenkraut* v. *Whitten* (1961) 56 Cal.2d 538, 544-546 [15 Cal.Rptr. 635, 364 P.2d 467]. An instruction based on the rule in *Borenkraut* requires a person of ordinary prudence to exercise extreme caution when engaged in an especially dangerous activity.[6]

When a movie stuntperson embarks upon a stunt such as driving or riding in a vehicle against opposing traffic, such a stuntperson is obviously engaged in an especially dangerous activity. Extreme caution is plainly called for. In contrast to the situations involved in *Austin* v. *Riverside Portland Cement Co., supra,* 44 Cal.2d 225, or *McDonald* v. *City of Oakland, supra,* 255 Cal.App.2d 816, the stuntperson ordinarily has ample opportunity to consider various precautions. The evidence in the case at bench indicates that the stuntpersons were permitted to utilize any safety devices they desired and could take additional time in order to do so. Such a circumstance provides no parallel to that in *Austin* v. *Riverside,* for example, where the ability to exercise safety precautions was lessened by the necessity of giving attention to the work at hand. ▮ The facts of the instant case more closely parallel those in cases where the risk arises from dealing with dangerous instrumentalities or materials. "[T]he care required of a reasonable person in dealing with such instrumentalities, because of the great risks involved, is so great that even a slight deviation from the standards of care will constitute negligence." (*Borenkraut* v. *Whitten, supra,* 56 Cal.2d at p. 545.)

---

[6]The instruction at issue in *Borenkraut* was, in pertinent part, as follows: ". . . [T]he amount of caution involved in the exercise of ordinary care, and hence required by law, increases or decreases as does the danger that reasonably should be apprehended." (*Borenkraut* v. *Whitten, supra,* 56 Cal.2d 538, 545.)

Moreover, the defense did not assign as negligence any act which plaintiff allegedly performed during the stunt itself. Rather, the defense argued she was negligent because she failed to take certain precautions prior to the stunt. The nature of the stunt did not prevent plaintiff from taking the precautions in question. Thus, we find the trial court did not err in refusing to give BAJI No. 3.40.

## VI. NEEDHAM'S EMPLOYMENT STATUS

In his appeal, Needham alleges that he was employed by Cannonball for the purpose of directing the movie "Cannonball Run." Thus, he claims he was plaintiff's' co-employee, which status bars any civil action and limits plaintiff to the workers' compensation recovery she had already received. In a related contention, Stuntman contends that Needham was not its employee and, hence, is not liable for Needham's negligent acts. The issue was put to the jury, which found that Needham was not an employee of Cannonball.

"Under the workers' compensation law, recovery of statutory benefits is an injured employee's sole remedy against 'the employer or against any other employee of the employer acting within the scope of his employment. . . .' (Lab. Code, § 3601, subd. (a); . . . However, this statutory restriction does not affect the employee's rights to tort damages from persons with whom the employee has no employment relationship. ([Lab. Code,] § 3852; *Witt* v. *Jackson* (1961) 57 Cal.2d 57, 69 [17 Cal.Rptr. 369, 366 P.2d 641].)" (*Marsh* v. *Tilley Steel Co.* (1980) 26 Cal.3d 486, 495 [162 Cal.Rptr. 320, 606 P.2d 355].)

There are situations in which a "general" employer lends an employee to another employer, creating a "special employment" relationship between the borrowing employer and the employee. In such situations, "the special employer becomes solely liable under the doctrine of respondeat superior for the employee's job-related torts." (26 Cal.3d at p. 492.) As our state Supreme Court has noted, "[S]pecial employment is most often resolved on the basis of 'reasonable *inferences* to be drawn from the circumstances shown.' Where the evidence, though not in conflict, permits conflicting inferences, ' ". . . the existence or nonexistence of the special employment relationship barring the injured employee's action at law is generally a question reserved for the trier of fact." ' ([*Kowalski* v. *Shell Oil Co.* (1979)] 23 Cal.3d [168] at p. 175 [151 Cal.Rptr. 671, 588 P.2d 811], italics added; see also *Miller* v. *Long Beach Oil Dev. Co.* (1959) 167 Cal.App.2d 546, 550 [334 P.2d 695].)" (*Marsh* v. *Tilley Steel Co., supra,* 26 Cal.3d at p. 493.)

At trial, Needham himself testified that his services as director for the movie "Cannonball Run" were secured by an employment contract between Stuntman and Northshore Investments. Needham signed the contract on behalf of Stuntman. Needham looked to and received from Stuntman his compensation and expenses related to the movie. Several other corporate entities had financial involvement in making the movie, and the new corporation, Cannonball, was set up for the sole purpose of making that movie and processing the income and expenses from it. Cannonball paid Stuntman for Needham's services in checks made payable to Stuntman. The foregoing evidence clearly raises the inference that Needham was not employed by Cannonball.

In conflict with this inference was evidence which showed that Cannonball had final control of the movie. This evidence indicated that the line and executive producers for "Cannonball Run" had authority over Needham and could override his directing decisions.

The existence of certain circumstances will tend to negate the existence of a special employment relationship. These circumstances are: "The employee is (1) not paid by and cannot be discharged by the borrower, (2) a skilled worker with substantial control over operational details, (3) not engaged in the borrower's usual business, (4) employed for only a brief period of time, and (5) using tools and equipment furnished by the lending employer. [Citations.]" (*Marsh v. Tilley Steel Company, supra,* 26 Cal.3d 486, 492.) Moreover, "where the servants of two employers are jointly engaged in a project of mutual interest, each employee ordinarily remains the servant of his own master and does not thereby become the special employee of the other. [Citations.]" (*Id.* at p. 493.) The jurors were properly instructed to take into consideration the foregoing factors. The evidence is sufficient to sustain the jury's finding and no allegation is made that the instruction was erroneous.

Stuntman further contends that it must be relieved of liability because the jury, in addition to finding that Needham was not an employee of Cannonball, also answered "no" to the following question: "During the making of the film, 'The Cannonball Run,' did STUNTMAN, INC. exercise partial concurrent control over Hal Needham as to how he performed his duties as a director?" Stuntman stretches reason and claims we must infer from the jury's answer a jury finding that Stuntman had no employer-employee relationship with Needham. No such inference can be derived. This question was put to the jurors to cover the possibility that the jury would find that Cannonball, as a borrowing employer, had established an employment relationship with Needham while at the same time it allowed Stuntman, the general employer, to retain a measure of control. The

jury did *not* make such a finding, but it is well established that "to escape liability, the general employer must relinquish full control of the employee for the time being, it not being sufficient that the employee is partially under the control of the third person . . . ." (*Doty* v. *Lacey* (1952) 114 Cal.App.2d 73, 78 [249 P.2d 550].) ■■ Had the jury here answered "yes," Stuntman would, under this rule, still be liable even if the jury had found Needham was employed by Cannonball. Clearly, the jury's answer related only to the issue of concurrency of control, an issue made moot by the finding that Needham was not employed by Cannonball.

Whether or not in reality Stuntman, as a corporate entity, was capable in and of itself of controlling Needham is beside the point. As the trial court properly observed in rejecting a Stuntman posttrial motion, Needham was nonetheless Stuntman's employee and "under those circumstances, whether the corporation which he owns controls him or not, which in reality is impossible, he is nevertheless using that form." The evidence indicated that Needham's services were employed by Stuntman whether or not Needham also had the ability, as sole shareholder and president of Stuntman, to control the corporation. ■■■ Since a private corporation is generally liable under the doctrine of respondeat superior for torts of its agents or employees committed while they are acting within the scope of their employment, as Needham clearly was, Stuntman, was properly assessed liability herein. (*Kelly* v. *General Telephone Co.* (1982) 136 Cal.App.3d 278, 286 [186 Cal.Rptr. 184]; 5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 37, p. 96.)

Needham also relies on *Home Box Office* v. *Directors Guild of America* (S.D.N.Y. 1982) 531 F.Supp. 578. That reliance is misplaced. Under the circumstances presented in that case, the federal district court held that loan-out companies (which Stuntman basically is) do "not alter the character of the employment relation between directors and the production companies for which they work. In sum, nothing in the nature or operation of loan-out companies affects the conclusion that the freelance directors who own such companies are not independent contractors or entrepreneurs." (*Id.* at p. 598.)

That case is easily distinguishable. First of all, the determination to be made therein was whether or not agreements between a union (the Directors' Guild of America) and freelance directors, loan-out companies, and production companies violated antitrust laws or fell under a statutory exemption allowing unions, acting in their self-interest, to combine with employees without antitrust liability. The issue was further refined to a question of whether the directors constituted an eligible labor group pursuant to the United States Supreme Court holding in *United States* v. *Hutche-*

*son* (1941) 312 U.S. 219, 229-231 [85 L.Ed. 788, 791-792, 61 S.Ct. 463]. The *Home Box Office* court held that they did. (*Home Box Office* v. *Directors Guild of America, supra,* 531 F.Supp. 578, 598.) No application to tort liability is embraced in *Home Box Office*. Moreover, the production companies at issue were television production companies, not production companies producing films for motion picture theaters.

Finally, the key contract at issue here is not one between the Directors' Guild and Cannonball nor even between Cannonball and Stuntman. Rather, the contract was between Stuntman and North Shore Investments. We are directed to nothing in the record which suggests that Needham's independence and creative control fit tightly into the mold described by the federal district court in deciding an antitrust contest between a union and a paid television programming corporation. Moreover, there are clearly other factual distinctions between the relations described in *Home Box Office* and those presented in the instant case. For example, the federal district court in *Home Box Office* described how the television network production companies treated the freelance directors as employees for tax purposes; the companies subjected the directors' compensation to withholding for income and Social Security taxes and reported the compensation on W-2 forms. (531 F. Supp. at p. 594.) In the case at bench, however, Stuntman's corporate secretary testified that Needham's W-2 form and tax deductions for the year 1980 (the production year for "Cannonball Run") were from Stuntman and not from Cannonball.

Hence, the employment relationships of Needham insulated neither him nor Stuntman from liability in the instant matter.

### DISPOSITION

The judgment is affirmed. Each party is to bear its own costs on appeal.

Lucas, P. J., and Ashby, J., concurred.

The petition of appellant Von Beltz for review by the Supreme Court was denied May 17, 1989. Kennard, J., did not participate therein.