[No. B219946. Second Dist., Div. Three. Feb. 24, 2011.]

ANTHONY ANGELOTTI, Plaintiff and Appellant, v.
THE WALT DISNEY COMPANY et al., Defendants and Respondents.

COUNSEL

Sayre & Levitt and Kent M. Henderson for Plaintiff and Appellant.

Dykema Gossett, Derek S. Whitefield, Tamara A. Husbands and Jill M. Wheaton for Defendants and Respondents.

OPINION

**CROSKEY, J.**—Anthony Angelotti was injured while rehearsing a stunt for a film. He filed a complaint against several parties associated with the film production. The trial court concluded that a production company, Second Mate Productions, Inc. (Second Mate), was Angelotti's special employer and that the workers' compensation exclusivity rule precluded any recovery against either Second Mate or its employee, Jim Stephan. The court also concluded that The Walt Disney Company (Disney Company) and other defendants owed Angelotti no duty of care. The court granted summary judgment in favor of the defendants.

Angelotti contends whether he was a special employee of Second Mate is a question of fact that cannot be resolved on summary judgment. He also contends Disney Company and other defendants assumed a duty to ensure that the production complied with occupational safety regulations, and those defendants retained control over the film production and affirmatively contributed to his injury by providing unsafe equipment and failing to ensure his safety.

We conclude that the evidence compels the conclusion that Angelotti was an employee of Second Mate and that the workers' compensation exclusivity rule precludes any recovery against Second Mate or Stephan. We also conclude that the undisputed evidence shows that Disney Company and other defendants did not provide the equipment used in the stunt and did not exercise their retained control in any manner that affirmatively contributed to Angelotti's injury. We will therefore affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. *Factual Background*

Second Mate entered into an agreement with Walt Disney Pictures in which Second Mate agreed to produce and Walt Disney Pictures agreed to

finance two movies. Walt Disney Pictures is a subsidiary of Disney Company. Second Mate expressly agreed to comply with all applicable occupational health and safety laws.

Disney Company prepared a production safety guidebook and provided it to Second Mate. The production safety guidebook included an injury and illness prevention program (Safety Program). The Safety Program provided for Second Mate to designate a production safety coordinator to act as a liaison to Disney Company's safety department. The Safety Program also stated that Disney Company's safety program administrator could conduct audits to evaluate Second Mate's implementation of the Safety Program. Mark Elliot, Marj Quick, and Hugh Rose were employees in Disney Company's safety department who audited the implementation of the Safety Program.

Second Mate hired Angelotti as a stunt performer through his loan-out company, Skiddadle Inc. Under the terms of the loan-out agreement, Skiddadle Inc. agreed to lend the services of Angelotti to Second Mate, and Second Mate agreed to pay Skiddadle Inc. for those services. An "Inducement" attached to the loan-out agreement and signed by Angelotti stated:

"For purposes of any and all Workers' Compensation statutes, law or regulations ('Workers' Compensation'), I acknowledge that an employment relationship exists between Producer [(Second Mate)] and me, Producer being my special employer under the Agreement. Accordingly, I acknowledge that in the event of my injury, illness, disability or death falling within the purview of Workers' Compensation, my rights and remedies (and those of my heirs, executors, administrators, successors and assigns) against Producer or Producer's affiliated companies and their respective officers, agents and employees (including, without limitation, any other special employee and any corporation or other entity furnishing to Producer or an affiliate company the services of any such other special employee) shall be governed by and limited to those provided by Workers' Compensation."

Second Mate contracted with Cast & Crew Production Payroll, Inc. (Cast & Crew), to provide payroll services, including payment of wages and payroll taxes. Cast & Crew also agreed to become the "employer of record" (capitalization omitted) for these purposes and to obtain workers' compensation insurance naming Second Mate as an additional insured.

Jim Stephan is the owner of Stephan Sports, a sole proprietorship. Stephan provided stunt equipment for use in the film production, including a device known as a descender. Using an electric motor, the descender spools out cable from which a stunt performer can be suspended. The descender

includes a braking device to slow or stop the descent. Stephan was operating the descender at the time of the incident.

Angelotti suffered injuries while rehearsing a stunt in July 2005. The stunt involved falling from a height of approximately 80 to 90 feet using the descender, turning five times in the air, and then hanging in the air with the appearance of being suspended by one ankle. The cable was attached to webbing that was wrapped five times around his body and attached to a body harness.[1] He descended in a free fall, then rolled five times in the air, and then was stopped by the cable before reaching the ground. His legs flew apart during the stunt. He suffered severe injuries to his pelvis and other parts of his body.

Angelotti filed a workers' compensation claim with Cast & Crew's insurer and received benefits.

### 2. Trial Court Proceedings

Angelotti filed a complaint in July 2007 and filed a first amended complaint in September 2007 against Disney Company, Walt Disney Pictures, Buena Vista Productions, Jerry Bruckheimer, Inc., Golden Oak Ranch Properties, Elliot, Quick, Rose, Stephan Sports, Stephan, and Second Mate. He alleges that Disney Company and other defendants employed Elliot, Quick, and Rose to control and supervise the safety of the production, including the stunt that Angelotti was performing when he was injured. He alleges that the same defendants provided the equipment used in the stunt and that the equipment was defective and unsafe. He also alleges that the stunt was unsafe and that the defendants failed to comply with occupational safety regulations.

Angelotti alleges counts for (1) negligent provision of unsafe equipment, against all defendants; (2) negligence, against all defendants; (3) negligent entrustment, against all defendants; (4) negligence per se, against all defendants; and (5) strict products liability, against Stephan Sports and Stephan.

Disney Company, Walt Disney Pictures, Buena Vista Productions, Jerry Bruckheimer, Inc., Golden Oak Ranch Properties, Elliot, Quick, and Rose (collectively, Disney defendants) together with Stephan Sports and Stephan filed a motion for summary judgment or summary adjudication in November 2008. They argued that the Disney defendants were involved in the production and distribution of the films but that they owed Angelotti no duty of care because they exerted no control over the performance of the stunt, provided

---

[1] Stephan declared that Angelotti declined a suggestion by the stunt crew to tie his legs together for the stunt. Angelotti testified in his deposition, however, that he was not asked to tie his legs together.

no equipment used in the stunt, and did not affirmatively contribute to Angelotti's injuries.[2] They argued with respect to the products liability count against Stephan Sports and Stephan that those defendants provided a service rather than a product and that the descender used in the stunt was not defective. They argued further that Angelotti had assumed the risks inherent in the stunt by declining to strap his legs together, despite the stunt crew's suggestion.

Second Mate and Stephan filed a separate motion for summary judgment as to Second Mate and summary adjudication of each count alleged against Stephan. They argued that Cast & Crew was Angelotti's general employer and Second Mate his special employer, that Stephan was an employee of Second Mate, and that workers' compensation provided the exclusive remedy against both defendants.

The trial court concluded with respect to the motion by the Disney defendants, Stephan Sports, and Stephan that the moving defendants owed Angelotti no duty of care and that Second Mate, rather than the moving defendants, was responsible for stunt coordination and compliance with occupational safety regulations. The court concluded that the Disney defendants did not affirmatively contribute to Angelotti's injury by monitoring Second Mate's implementation of the Safety Program and that they exercised no control over the performance of the stunt. The court also concluded that the descender was not a product for purposes of strict products liability and that there was no evidence that it was defective. The court concluded further that Buena Vista Productions was not involved in the production in any manner and that there was no basis to hold Golden Oak Ranch Properties liable as a landowner. The court sustained the moving defendants' evidentiary objections and granted summary judgment in favor of the Disney defendants, Stephan Sports, and Stephan.

The trial court concluded with respect to the motion by Second Mate and Stephan that Second Mate was Angelotti's special employer, that Stephan also was an employee of Second Mate, and that workers' compensation was Angelotti's exclusive remedy against both defendants. The court sustained the moving defendants' evidentiary objections, granted summary judgment in favor of Second Mate, and granted summary adjudication in favor of Stephan on counts one through four.

The trial court entered a judgment in favor of all defendants in August 2009. Angelotti timely appealed the judgment.

---

[2] The defendants also argued that Buena Vista Productions was not involved in the films in any way and that Angelotti failed to allege any basis to hold Golden Oak Ranch Properties liable as a landowner.

## CONTENTIONS

Angelotti contends (1) the evidence creates a triable issue of fact as to whether he was an employee of Second Mate, precluding summary judgment in favor of Second Mate and Stephan based on the workers' compensation exclusivity rule; (2) the Disney defendants assumed a nondelegable duty to ensure compliance with occupational safety regulations and breached that duty by failing to ensure the safety of the stunt; and (3) the Disney defendants retained control over the film production and affirmatively contributed to his injury by their acts and omissions.[3]

## DISCUSSION

### 1. Standard of Review

Summary judgment is appropriate only if there is no triable issue of material fact and the moving party is entitled to judgment in its favor as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) A defendant moving for summary judgment must show that one or more elements of the plaintiff's cause of action cannot be established or that there is a complete defense. (*Id.*, subd. (p)(2).) The defendant can satisfy its burden by presenting evidence that negates an element of the cause of action or evidence that the plaintiff does not possess and cannot reasonably expect to obtain evidence needed to support an element of the cause of action. (*Miller v. Department of Corrections* (2005) 36 Cal.4th 446, 460 [30 Cal.Rptr.3d 797, 115 P.3d 77] (*Miller*).) If the defendant meets this burden, the burden shifts to the plaintiff to set forth "specific facts" showing that a triable issue of material fact exists. (Code Civ. Proc., § 437c, subd. (p)(2).)

We review the trial court's ruling de novo, liberally construe the evidence in favor of the party opposing the motion, and resolve all doubts concerning the evidence in favor of the opposing party. (*Miller, supra*, 36 Cal.4th at p. 460.) We will affirm a summary judgment if it is correct on any ground that the parties had an adequate opportunity to address in the trial court, regardless of the trial court's stated reasons. (*California School of Culinary Arts v. Lujan* (2003) 112 Cal.App.4th 16, 22 [4 Cal.Rptr.3d 785]; see Code Civ. Proc., § 437c, subd. (m)(2).)

---

[3] Angelotti does not challenge the summary judgment in favor of Stephan Sports and therefore abandons any claim of error as to that defendant.

### 2. The Trial Court Properly Granted Summary Judgment in Favor of Second Mate and Stephan

#### a. Governing Law

Workers' compensation provides the exclusive remedy against an employer for an injury sustained by an employee in the course of employment and compensable under the workers' compensation law. (Lab. Code, §§ 3600, subd. (a), 3602, subd. (a); *Charles J. Vacanti, M.D., Inc. v. State Comp. Ins. Fund* (2001) 24 Cal.4th 800, 812–813 [102 Cal.Rptr.2d 562, 14 P.3d 234].) This precludes a tort remedy against the employer if the conditions of compensation are present. The workers' compensation exclusivity rule also precludes a tort remedy against another employee of the same employer acting within the scope of employment, except in certain circumstances that are inapplicable here. (Lab. Code, § 3601, subd. (a).) The basis for the exclusivity rule is the "presumed 'compensation bargain' " in which the employer assumes liability for injury or death arising out of and in the course of employment without regard to fault and compensation is relatively swift, in exchange for limitations on the amount of liability. (*Shoemaker v. Myers* (1990) 52 Cal.3d 1, 16 [276 Cal.Rptr. 303, 801 P.2d 1054].)

An "employee" is defined for purposes of workers' compensation as, in relevant part, "every person in the service of an employer under any appointment or contract of hire or apprenticeship, express or implied, oral or written, whether lawfully or unlawfully employed . . . ." (Lab. Code, § 3351.) A person rendering service for another is presumed to be an employee for purposes of workers' compensation, unless that person is an independent contractor or otherwise expressly excluded under the workers' compensation law. (*Id.*, § 3357.) An independent contractor is defined for purposes of workers' compensation as "any person who renders service for a specified recompense for a specified result, under the control of his principal as to the result of his work only and not as to the means by which such result is accomplished." (*Id.*, § 3353.) The Workers' Compensation Act must be liberally construed for the purpose of extending benefits to persons injured in their employment. (*Id.*, § 3202.)

An employee may have two employers for purposes of workers' compensation. " 'Where an employer sends an employee to do work for another person, and both have the right to exercise certain powers of control over the employee, that employee may be held to have two employers—his original or "general" employer and a second, the "special" employer.' [Citation.]" (*Kowalski v. Shell Oil Co.* (1979) 23 Cal.3d 168, 174 [151 Cal.Rptr. 671, 588 P.2d 811] (*Kowalski*).) Both the general and special employer are responsible for providing workers' compensation benefits, and

both are protected by the exclusivity rule. (*Id.* at p. 175.) The test for determining the existence of an employment relationship for purposes of workers' compensation is essentially the same whether the inquiry concerns general or special employment.[4] (*Johnson v. Berkofsky-Barret Productions, Inc.* (1989) 211 Cal.App.3d 1067, 1072, fn. 4 [260 Cal.Rptr. 67].)

■ The principal test of an employment relationship is whether the person to whom service is rendered has the right to control the manner and means of accomplishing the desired result. (*S. G. Borello & Sons, Inc. v. Department of Industrial Relations* (1989) 48 Cal.3d 341, 350 [256 Cal.Rptr. 543, 769 P.2d 399] (*Borello*); *Kowalski, supra,* 23 Cal.3d at p. 175.) A secondary factor also constituting strong evidence in support of an employment relationship is the right to discharge at will without cause. (*Borello, supra,* 48 Cal.3d at p. 350; accord, *Kowalski, supra,* 23 Cal.3d at p. 177.)

Other secondary factors to consider in determining whether an employment relationship exists include whether the person performing services is engaged in a distinct occupation or business; whether the work is usually done under the direction of the principal or by a specialist without supervision; whether the work requires a particular skill; whether the principal or the worker supplies the instrumentalities, tools, and place of work; whether the worker has an opportunity for profit or loss depending on his or her managerial skill; the duration of the work; whether payment is by time or by the job; whether the work is a part of the regular business of the principal; and whether the parties believe they are creating an employment relationship. (*Borello, supra,* 48 Cal.3d at pp. 351, 355.)

■ " 'Generally, . . . the individual factors cannot be applied mechanically as separate tests; they are intertwined and their weight depends often on particular combinations.' [Citation.]" (*Borello, supra,* 48 Cal.3d at p. 351.) The label used by the parties is not dispositive. (*Id.* at p. 349; *Kowalski, supra,* 23 Cal.3d at p. 176.) Instead, "[t]he nature of the work, and the overall arrangement between the parties, must be examined" while keeping in mind the protective purposes of the workers' compensation law. (*Borello, supra,* 48 Cal.3d at p. 353.)

The existence of an employment relationship is a question for the trier of fact, but can be decided by the court as a matter of law if the evidence supports only one reasonable conclusion. (*Borello, supra,* 48 Cal.3d at p. 349; *Caso v. Nimrod Productions, Inc.* (2008) 163 Cal.App.4th 881, 889 [77 Cal.Rptr.3d 313].)

---

[4] We therefore need not decide whether Skiddadle Inc. was Angelotti's general employer, as he argues, or whether Cast & Crew was his general employer, as the defendants argue.

### b.   *Angelotti Was an Employee of Second Mate*

Angelotti worked as a stunt performer under the direction of both the stunt coordinator, who was an employee of Second Mate, and the films' director. The stunt coordinator instructed Angelotti on his daily work schedule and tasks. In light of the nature of the work and the evidence of his actual experience on the job, Second Mate clearly had the right to control the manner and method of Angelotti's work. Angelotti does not contend otherwise. This is a compelling, but not necessarily conclusive, indication that he was an employee of Second Mate.

Second Mate hired Angelotti, through his loan-out company, for one week at a time under contracts of one week's duration. Thus, Second Mate retained the right to terminate the relationship at the end of each week with no obligation to rehire him. We regard this as the practical equivalent of the right to discharge at will, which is another strong indication that Angelotti was an employee of Second Mate. Several other secondary factors also point to the existence of an employment relationship:

■   Although stunt performance requires particular skill, the significance of this factor is mitigated where the work is done under the direction of another and the stunt performer has no substantial control over the operational details, as here. (*Wedeck v. Unocal Corp.* (1997) 59 Cal.App.4th 848, 859 [69 Cal.Rptr.2d 501].) Second Mate provided the place of work and all of the equipment necessary to the job, despite the fact that Angelotti elected to use some of his own equipment. Angelotti was paid a fixed weekly wage and had no opportunity for profit or loss depending on his managerial skills. Second Mate hired Angelotti on a weekly basis beginning in approximately December 2004, and the accident occurred seven months later in July 2005, so the duration of work was substantial. Angelotti was paid by time rather than by the job. Film production, including stunts performed for the films, was part of the regular business of Second Mate as a production company. Finally, the statement in the Inducement expressly acknowledging the existence of an employment relationship with Second Mate shows the parties' intention to create an employment relationship. These factors support the existence of an employment relationship.

*Von Beltz v. Stuntman, Inc.* (1989) 207 Cal.App.3d 1467 [255 Cal.Rptr. 755], cited by Angelotti, does not persuade us to the contrary. *Von Beltz* involved a suit by an injured stunt performer against a movie director and the director's loan-out company. (*Id.* at p. 1474.) The director claimed that he and the plaintiff were employees of the same production company and that the suit against him therefore was barred by the workers' compensation exclusivity rule. (*Id.* at p. 1486.) The jury found that the director was not an employee

of the production company. (*Ibid.*) The Court of Appeal stated that evidence that the director was hired for the film by another entity, that he was hired through his loan-out company rather than individually, and that the production company paid his loan-out company for his services rather than paying him directly suggested that the director was not an employee of the production company. (*Id.* at p. 1487.) *Von Beltz* held that this evidence supported the jury's finding that he was not an employee of the production company, despite evidence that the production company had the right to control the director's decisions. (*Ibid.*)

■ In our view, the typical use of a loan-out company in the hiring of talent in the entertainment industry does not mitigate the right of control or the other factors indicating the existence of an employment relationship. We therefore decline to follow *Von Beltz v. Stuntman, Inc., supra,* 207 Cal.App.3d 1467, to the extent that it may suggest to the contrary.

■ Viewing the evidence as a whole, we conclude that the only reasonable inference is that Angelotti was an employee of Second Mate. The workers' compensation exclusivity rule therefore precludes any tort remedy against Second Mate or Stephan, and summary judgment in favor of those defendants was proper.[5]

### 3. *The Trial Court Properly Granted Summary Judgment in Favor of the Disney Defendants*

#### a. *The Disney Defendants Did Not Assume a Duty of Care*

Angelotti contends the Disney defendants assumed a duty to implement the Safety Program and to ensure that all stunts were safely designed and executed. He cites as the source of that duty a provision in the Safety Program stating that stunts should be coordinated and discussed with the safety program administrator and identifying a Disney Company employee, Quick, as that person. Angelotti argues further that the Disney defendants cannot avoid their assumed duty by delegating the responsibilities to Second Mate because the duty to implement a safety program required by occupational safety regulations is a nondelegable duty.

We conclude that the Disney defendants did not assume a duty to implement the Safety Program or to ensure the safety of stunts. The Safety

---

[5] Angelotti does not challenge the trial court's conclusion that Stephan was an employee of Second Mate who was acting in the course and scope of his employment. Instead, Angelotti argues that he and Stephan were not coemployees because Angelotti was not an employee of Second Mate. In light of our conclusion that Angelotti was an employee of Second Mate, he has shown no error in the summary judgment in favor of Stephan.

Program expressly stated that the designated individuals from Disney Company's safety department "are safety advisors and resources that are available to productions, and they do not assume or replace the production company's role in safety management," and that the production company's own safety coordinators were responsible for implementing the Safety Program. Moreover, in its production and financing agreement with Walt Disney Pictures, Second Mate expressly agreed to comply with all applicable occupational safety laws and to implement a safety program. In light of our conclusion that the Disney defendants did not assume a duty, we need not decide whether such a duty was nondelegable.

> b. *The Disney Defendants Did Not Affirmatively Contribute to Angelotti's Injury*

Angelotti also contends the Disney defendants retained control over the film production and stunt performances and affirmatively contributed to his injury by providing unsafe equipment and failing to ensure his safety. He relies principally on *Hooker v. Department of Transportation* (2002) 27 Cal.4th 198 [115 Cal.Rptr.2d 853, 38 P.3d 1081] (*Hooker*), which held that the hirer of an independent contractor is not liable to an employee of the contractor merely because the hirer retained control over workplace safety conditions, but the hirer is liable if it actually exercised its retained control in a way that "affirmatively contributed" to the employee's injury. (*Id.* at p. 202, italics omitted.)

*Hooker, supra*, 27 Cal.4th at page 210, stated, "it would be unfair to impose tort liability on the hirer of the contractor merely because the hirer retained the ability to exercise control over safety at the worksite. In fairness, . . . the imposition of tort liability on a hirer should depend on whether the hirer *exercised* the control that was retained in a manner that *affirmatively* contributed to the injury of the contractor's employee." *Hooker* explained, "[s]uch affirmative contribution need not always be in the form of actively directing a contractor or contractor's employee. There will be times when a hirer will be liable for its omissions. For example, if the hirer promises to undertake a particular safety measure, then the hirer's negligent failure to do so should result in liability if such negligence leads to an employee injury." (*Id.* at p. 212, fn. 3.)

" '[A] general contractor owes no duty of care to an employee of a subcontractor to prevent or correct unsafe procedures or practices to which the contractor did not contribute by direction, induced reliance, or other affirmative conduct. The mere failure to exercise a power to compel the subcontractor to adopt safer procedures does not, without more, violate any duty owed to the plaintiff.' " (*Hooker, supra*, 27 Cal.4th at p. 209, quoting

*Kinney v. CSB Construction, Inc.* (2001) 87 Cal.App.4th 28, 39 [103 Cal.Rptr.2d 594].) Thus, the hirer of an independent contractor owes no duty to an employee of the contractor to exercise its retained control so as to prevent or correct unsafe working conditions that the hirer did not affirmatively contribute to in some manner.

Angelotti cites no evidence that the Disney defendants provided the equipment used in the stunt, and the undisputed evidence shows, to the contrary, that Second Mate leased the equipment from Stephan Sports. The undisputed evidence also shows that the Disney defendants did not participate in the design or coordination of the stunt. Unlike the example cited in *Hooker, supra,* 27 Cal.4th at page 212, footnote 3, the Disney defendants did not promise to undertake any particular safety measure. Instead, the undisputed evidence shows that the Disney defendants did not exercise their retained control in any manner that affirmatively contributed to Angelotti's injury. We therefore conclude that the Disney defendants owed Angelotti no duty of care on this basis and that the trial court properly granted summary judgment in favor of the Disney defendants.

## DISPOSITION

The judgment is affirmed. The defendants are entitled to recover their costs on appeal.

Klein, P. J., and Aldrich, J., concurring.