**THIRD DIVISION**
**MCFADDEN, C. J.,**
**DOYLE, P. J., and HODGES, J.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

*DEADLINES ARE NO LONGER TOLLED IN THIS COURT. ALL FILINGS MUST BE SUBMITTED WITHIN THE TIMES SET BY OUR COURT RULES.*

**March 11, 2021**

# In the Court of Appeals of Georgia

A20A1896. STALWART FILMS LLC, et al. v. BERNECKER, et al.    DO-066

DOYLE, Presiding Judge.

Following a two-week jury trial on claims filed by Susan Bernecker, individually and as the Executrix of the Estate of John Bernecker, and Hagan Bernecker, individually, ("plaintiffs") regarding the death of Susan's and Hagan's son, John Bernecker ("Bernecker"), a verdict was entered in favor of the plaintiffs against Stalwart Films, LLC (individually, "Stalwart"), Tom Luse, Jeffrey January, Monty Simons, and TWD Productions VIII, LLC (individually, "TWD8"), (collectively "defendants") for negligence that resulted in Bernecker's death during a stunt he performed on the set of the television production *The Walking Dead*.

On appeal, the defendants argue that the trial court erred by denying their motion for a directed verdict on the grounds that (1) Bernecker was an employee or

borrowed servant for Stalwart, and the claims were barred by the exclusive remedy

provision of the Workers' Compensation Act[1] ("WCA"); (2) even if Bernecker was

an independent contractor, Stalwart was Bernecker's statutory employer, which status

also barred the claims under the WCA; (3) even if Bernecker was an independent

contractor and Stalwart was not his statutory employer, Stalwart owed no legal duty

to Bernecker; (4) the plaintiffs' claims against Luse, January, and Simons were barred

because they were Bernecker's co-employees; (5) alternatively, Luse, January, and

Simons owed no legal duty to Bernecker; (6) TWD8 owed no legal duty to Bernecker;

and (7) Bernecker assumed the risk. For the reasons that follow, we reverse.

When reviewing "the denial of a motion for a directed verdict, we construe the

evidence in the light most favorable to the party opposing the motion," determining

"whether there is any evidence to support the jury's verdict" and applying the de novo

standard of review to any questions of law.[2] "A directed verdict is authorized only

---

[1] See OCGA § 34-9-1 et seq.

[2] (Punctuation omitted.) *City of Alpharetta v. Hamby*, 352 Ga. App. 511, 512 (835 SE2d 366) (2019), quoting *Brown v. Tucker*, 337 Ga. App. 704, 720 (8) (788 SE2d 810) (2016); OCGA § 9-11-50 (a).

when there is no conflict in the evidence on any material issue and the evidence introduced, with all reasonable deductions, demands a particular verdict."[3]

Viewed in this light, the record shows that Bernecker was performing a high stunt fall from a balcony on July 12, 2017, during filming of an episode of Season 8 of *The Walking Dead*. The completed scene was planned to depict the character played by Austin Amelio shooting the character played by Griffin Freeman in the back while the two are on a narrow balcony. The balcony had a railing with two round metal beams, and in the area where Freeman was positioned and from where Bernecker would perform the fall, there were sheets of corrugated metal — one up to the top rail and one up past the railing and immediately to Bernecker's left hand side. The choreography of the scene called for the following: Amelio would shoot Freeman in the back, Freeman would slump over the rail, Amelio would grab Freeman at the belt, and then Amelio would "throw" or pitch Freeman's slumping body over a balcony rail.

Bernecker's performance consisted of dropping his prop assault rifle, going head first over the metal balcony rail beside the metal, rotating, and landing on his

---

[3] (Punctuation omitted.) *Marwede v. EQR/Lincoln Ltd. Partnership*, 284 Ga. App. 404, 407 (2) (643 SE2d 766) (2007), quoting *H. J. Russell & Co. v. Jones*, 250 Ga. App. 28, 28-29 (550 SE2d 450) (2001).

back approximately 21 feet down into a "catcher system," which consisted of a 10 feet by 10 feet area of cardboard boxes[4] with 2 "port-a-pits" atop the boxes. The balcony, although it was only part of a film set and not a true building, had a commercial height railing, which was more difficult to clear without using a step called an "apple box." Although Simons, who was the stunt coordinator, served as a spotter at the far end of the catcher system, no other spotters were used on other sides of the catcher nor did the boxes extend all the way to the back wall behind the balcony.

On his first take of the stunt, Bernecker was fatally injured when his head struck the unprotected concrete between the catcher system and the wall under the balcony. Although he was placed on life support, Bernecker never regained consciousness and eventually died.

The plaintiffs filed claims arising from Bernecker's injuries and death, and the defendants filed multiple motions for summary judgment. In three separate orders, the trial court denied the defendants' motions for summary judgment on the issues of the

---

[4] The plaintiffs' expert testified that cardboard boxes are industry standard for catching performers during a fall and are layered on top of each other if necessary.

WCA exclusive remedy provision; whether AMC and TWD8 had a legal duty to Bernecker; and whether Bernecker assumed the risk.[5]

At trial, the plaintiffs' accident reconstruction and biomechanical expert hypothesized that Bernecker became entangled in the railing after Amelio inadvertently touched him in the back with his prop handgun, despite Amelio being warned specifically not to touch Bernecker during the stunt. The expert opined that based on the video of the fall, Bernecker's intentional stunt was interrupted by Amelio's inadvertent touching, turning the stunt into an unintentional fall, which Bernecker either reflexively or intentionally attempted to control by grabbing onto the rail, resulting in a pendulum swing propelling him to land headfirst past the catcher system onto the unprotected area of concrete.

The plaintiffs argue that the Injury and Illness Prevention Program ("IIPP"), which was prepared by TWD8, created a duty as to TWD8, Stalwart, Luse, January, and Simon to supervise Bernecker's safety. According to the IIPP, AMC or TWD8 developed the IIPP to provide Stalwart with safety protocol to be implemented on the

---

[5] The defendants filed a consolidated motion for reconsideration of the trial court's orders denying the motions for summary judgment, which motion for reconsideration the trial court denied. Thereafter, the defendants filed a request for a certificate of immediate review, which the trial court denied the following day, finding that the defendants had delayed filing the request until the eve of trial.

5

set. The plaintiffs argued that Stalwart failed to have a production safety representative on set in order to fulfill requirements of the IIPP.

Luse was the unit production manager on Season 8 of the show. Under the IIPP, a unit production manager is responsible for the effective administration and implementation of the IIPP and was responsible for making sure that the first assistant director and stunt coordinator met their responsibilities under the IIPP. Luse testified that although he shared responsibilities with others, he was in charge of the episode in question, and January reported to him. Luse also testified that while he was responsible for overall safety, he was not an expert in stunts and relied on Simons's knowledge and experience in determining what was necessary to perform the stunt safely.

January was the first assistant director on the show, and he was responsible for educating crew on safety requirements and conducting safety meetings and was supposed to discuss the safety of stunts with Luse and Simons. January did not question whether spotters or additional padding were necessary for the stunt, despite being in charge of safety according to the IIPP and being familiar with industry safety bulletins that included information on the "use of sufficient numbers of spotters," inspections of the fall area, and "guidelines for safe use of" catch systems because he

6

relied on Simons's expertise. January disputed that he had control over Simons and testified that they worked "in tandem."

Simons was the stunt coordinator for the show, which position was "[r]esponsible for the safe performance of stunts and supervision of all persons involved" per the IIPP. He testified that Luse was his boss, but January was more of a "co-safety representative" to whom Simons would report on occasion.

The plaintiffs' expert on movie stunts and coordination testified that the stunt coordinator has to foresee all the things that may go wrong with a stunt and protect against them, and the stunt coordinator works closely with the first assistant director on managing stunt safety. The expert testified that although Bernecker may have asked for the catcher to be moved out and away from the wall, he was asking for *his target to be moved*, which is where he was attempting to land; however, the stunt coordinator was responsible for foreseeing how the stunt could go wrong if Bernecker did not land where he was supposed to, and he should have added more boxes between the catcher and the back wall to guard against that possibility.

The defendants moved for a directed verdict at the end of the plaintiffs' case and again prior to jury deliberation, incorporating their arguments from summary judgment and arguing that the plaintiffs' claims (1) were barred by the WCA,

7

including that even if Bernecker was found to be an independent contractor, he was a statutory employee of TWD8 under OCGA § 34-9-11, (2) failed because the defendants owed Bernecker no duty of care, or (3) were barred because Bernecker assumed the risk. The trial court denied the motions, finding that sufficient evidence was presented to create questions of fact. The defendants renewed their motions at the close of their own case.

The jury returned a verdict in favor of the plaintiffs, specifically finding that "[a]s to John Bernecker's working status on the date of the stunt, . . . Bernecker was an independent contractor at Stalwart . . ." as opposed to an employee. The jury found that all but two of the defendants were negligent, and their conduct was the proximate cause of Bernecker's death.[6] The jury found that Bernecker was only six percent at fault for his own injuries, apportioned the remaining ninety-four percent of fault to all but two of the defendants, and awarded the plaintiffs $8.6 million in damages.[7] Thereafter, the trial court entered the verdict and final judgment, reduced the total

---

[6] The jury found that AMC Network, Inc., and Amelio were not negligent. Claims against various other defendants were dismissed without prejudice prior to trial.

[7] The jury did not award punitive damages.

8

award to $8,084,000 for the percentage of damage assigned to Bernecker by the jury. This appeal followed.

1. The defendants argue that the trial court erred by denying their motions for a directed verdict because the plaintiffs' claims were barred by the exclusive remedy provision of the WCA.

"Under OCGA § 34-9-11 (a), the WCA is the exclusive remedy for injuries by accident arising out of and in the course of employment."[8]

Specifically, the defendants contend that Bernecker was an employee of Stalwart based on the parties' contract or Bernecker's membership in the Screen Actor's Guild ("SAG") and SAG's applicable collective-bargaining agreement documents.[9] The plaintiffs contend that there was a question of fact as to whether Bernecker or some unknown individual signed the "Stunt Performer's Daily

---

[8] (Punctuation omitted.) *Sturgess v. OA Logistics Svcs.*, 336 Ga. App. 134, 135 (1) (784 SE2d 432) (2016).

[9] To the extent that the defendants argue that the trial court should have admitted certain testimony regarding the SAG collective bargaining agreement, we do not review this improper expansion of their enumerations of error on appeal. See *Wright v. Dept. of Natural Resources*, 254 Ga. App. 450, 454 (562 SE2d 515) (2002) ("An appellant cannot use an appellate brief to expand his or her enumeration of errors by arguing the incorrectness of a trial court's ruling not mentioned in the enumeration.") (punctuation omitted).

Contract," and therefore, the trial court properly denied the motions for directed verdict.

Pretermitting whether the written contract was authentic,[10] the undisputed material evidence presented at trial established that Bernecker was an employee of Stalwart when he performed the stunt on the day in question.

> [U]nder longstanding Georgia law, the true test to be applied in determining whether the relationship of the parties under a contract for the performance of labor is that of employer and servant, or employer and independent contractor, lies in whether the contract gives, or the employer assumes, the right to control the time, manner and method of executing the work, as distinguished from the right merely to require certain definite results in conformity to the contract.[11]

---

[10] The document is not ambiguous. It refers to Stalwart as the "employer-for-hire," and in the attached "Schedule A" it states in paragraph "1. Employment: This Agreement covers the employment of the above named Stunt Performer by [Stalwart]. . . ." To the extent that the plaintiffs argued that it was ambiguous because there was no signature for Bernecker's loan-out personal corporation, Bernecker's signature appears next to "performer" and would create a clear employer-employee relationship rather than that of a borrowed servant normally created under industry contracts. See, e.g., *Angelotti v. The Walt Disney Co.*, 192 Cal. App. 4th 1394, 1406 (2) (b) (121 CalRptr3d 863) (2011) ("the typical use of a loan-out company in the hiring of talent in the entertainment industry does not mitigate the right of control or the other factors indicating the existence of an employment relationship").

[11] (Punctuation omitted.) *Estes v. G&W Carriers* 354 Ga. App. 156, 157 (2) (840 SE2d 486) (2020) , citing *Golosh v. Cherokee Cab Co.*, 226 Ga. 636, 637 (176 SE2d 925) (1970). See also OCGA § 34-9-2 (e).

"The right to control the time means the employer has assumed the right to control the person's actual hours of work. The right to control the manner and method means the employer has assumed the right to tell the person how to perform all details of the job, including the tools he should use and the procedures he should follow."[12] In this case, although Bernecker could request minor changes to assist him in performing the stunt, such as a higher apple box lift or a larger catcher system, or he could refuse to perform the stunt if he felt unsafe, ultimately Stalwart retained the right to control the time, manner, and method of the work Bernecker performed.[13] The stunt was choreographed as part of a larger scene, and Bernecker was directed as to how exactly he should appear to act during the stunt. His slightest movement or body placement was subject to the direction of Stalwart. Moreover, Bernecker had a specific call time on a specific day, he was expected to perform when the director called for the scene, and he did not have authority to change the time when he could perform.

---

[12] (Punctuation omitted.) *Boatright v. Old Dominion Ins. Co.*, 304 Ga. App. 119, 120 (1) (695 SE2d 408) (2010), quoting *Palma v. Ga. Farm Bureau Ins. Co.*, 270 Ga. App. 333, 336 (606 SE2d 341) (2004).

[13] See *Estes*, 354 Ga. App. at 157-159 (2).

11

The plaintiffs heavily rely on the fact that Stalwart issued Bernecker an Internal Revenue Service ("IRS") Form 1099 and did not withhold taxes as evidence of a factual dispute as to Bernecker's employment status; however, this Court previously has held that "the fact that [an employer] issued its workers [IRS] Form 1099 (rather than Form W-2) and did not withhold taxes from their paychecks or provide insurance for the workers does not create a jury question on [Bernecker's] status as an employee."[14]

The plaintiffs also rely on comparisons to the agreements between Stalwart and its other employees as evidence that Bernecker was not an employee. But the existence and contents of those agreements, which involved individuals performing throughout the season or every week, are immaterial to the nature of the relationship between Bernecker and Stalwart based on the undisputed material evidence that Stalwart controlled the time, method, and manner of Bernecker's work.[15] To the extent that Bernecker had a personal loan-out company, which is normal in the

---

[14] (Punctuation omitted.) Id. at 159 (2), quoting *Boatright*, 304 Ga. App. at 121 (1).

[15] See *Estes*, 354 Ga. App. at 158-159 (2).

industry,[16] the existence of a contract between the loan-out company and Stalwart would only evince that Bernecker was a borrowed servant of Stalwart's, and it would not change the ultimate conclusion that a directed verdict was demanded as to this issue.[17] The result of either status — that Bernecker was a direct employee of Stalwart or that he was a borrowed servant of Stalwart — barred the plaintiffs' tort claims against Stalwart. Accordingly, the trial court erred by denying the motion for directed verdict on the basis that the WCA barred the plaintiffs' claims against Stalwart.

2. Based on our holding in Division 1 that Bernecker was an employee or borrowed servant of Stalwart at the time of his injuries, the trial court also erred by failing to grant a directed verdict to Luse, January, and Simons as co-employees of Bernecker.[18]

---

[16] See, e.g., *Angelotti*, 192 Cal. App. 4th at 1406 (2) (b).

[17] See *Bexley v. Southwire Co.*, 168 Ga. App. 431, 432 (1) (309 SE2d 379) (1983) ("In order for an employee to be a borrowed employee, the evidence must show that (1) the special master had complete control and direction of the servant for the occasion; (2) the general master had no such control, and (3) the special master had the exclusive right to discharge the servant.") (punctuation omitted), citing *Six Flags Over Ga. v. Hill*, 247 Ga. 375, 377 (276 SE2d 572) (1981).

[18] See OCGA § 34-9-11 (a). See, e.g., *Sprowson v. Villalobos*, 355 Ga. App. 279, 281 (841 SE2d 453) (2020) (explaining that borrowed servants were employees of the same employer); *Dickey v. Harden*, 202 Ga. App. 645, 645-646 (414 SE2d 924) (1992) (explaining that employees of same employer are immune from tort liability

3. Finally, there simply is no evidence that TWD8 breached a duty to Bernecker, even if TWD8 admitted in its answer that it was generally responsible for "funding and production" of the series. To the extent that the plaintiffs argued that TWD8 created a duty for themselves as to Bernecker by providing the IIPP to Stalwart, the plaintiffs wholly failed to establish that the mere existence of the IIPP created any specific duty for TWD8 as to Bernecker in this instance, that TWD8 breached that duty, or that such a breach was the proximate cause of Bernecker's injuries.[19]

*Judgment reversed. McFadden, C. J., and Hodges, J., concur.*

---

to their co-workers under the WCA).

[19] See, e.g., *Angelotti*, 192 Cal. App. 4th at 1407-1408 (3) (b) (evidence failed to establish that the general contractor production company owed a duty to an employee of a subcontractor). See also *Reed v. Carolina Cas. Ins. Co.*, 327 Ga. App. 130, 132 (2) (762 SE2d 90) (2014) (explaining that a plaintiff must prove that the defendant's negligence was both the "cause in fact" and the "proximate cause" of the injury) (punctuation omitted); *Lawson v. Entech Enterprises, Inc.*, 294 Ga. App. 305, 309-310 (1) (669 SE2d 211) (2008) ("what duty a defendant owes is a question of legal policy to be decided as an issue of law" and because the plaintiff has not established that the defendant "owed the decedent a contractual duty or one established by law or statute, [the] action for negligence cannot be maintained") (punctuation and citations omitted). To the extent that the plaintiffs argued that TWD8 was a producer along with Stalwart as an alter ego of Bernecker's employer, any claims against it would be barred under the WCA. See *Beck v. Flint Constr. Co.*, 154 Ga. App. 490, 492-493 (268 SE2d 739) (1980).