**FOURTH DIVISION**
**DILLARD, P. J.,**
**MERCIER, J., and SENIOR JUDGE FULLER**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules

**September 22, 2025**

**NOT TO BE OFFICIALLY REPORTED**

# In the Court of Appeals of Georgia

A25A0751, A25A0752. REEL SECURITY CORPORATION OF GEORGIA v. SWAP MEAT FILMS, INC., et al.; and vice versa.

FULLER, Senior Judge.

This is a dispute regarding the insurance and indemnification provisions in a service contract between Reel Security Corporation of Georgia and Swap Meat Films, Inc. The trial court granted summary judgment to both Reel Security and Swap Meat on different issues, and both parties have appealed. In Case No. A25A0751, we affirm, and in Case No. A25A0752, we affirm in part and reverse in part.

It is well settled that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that

the moving party is entitled to a judgment as a matter of law[.]" OCGA § 9-11-56 (c). Moreover, contract disputes are "particularly well suited for adjudication by summary judgment because construction of contracts is ordinarily a matter of law for the court." *Stankovich v. Axis Ins. Co.*, 365 Ga. App. 877, 877 (880 SE2d 366) (2022) (punctuation and footnote omitted). Of course, we review the trial court's ruling on summary judgment de novo and construe the evidence in the light most favorable to the nonmovant. Id.

The facts are largely undisputed. Reel Security and Swap Meat entered into a contract whereby Reel Security would provide security services from October 2019 until December 2019 to Swap Meat during the filming of a horror movie, which was later released under the title "Freaky." The main purpose of on-set security is to deter people from getting too close to the production.

The contract between Reel Security and Swap Meat ("the Agreement") specified that Reel Security would "furnish unarmed security personnel" on location as ordered by Swap Meat and that Reel Security's personnel would "perform services in accordance with" Swap Meat's instructions. The Agreement also contained provisions regarding insurance and indemnification.

On the evening of November 1, 2019, Reel Security employee Tomesha Brown reported to a bowling alley in Union City to provide security services. The film crew was already onsite working, bringing in their equipment. Brown arrived a bit early for her shift, which was to begin at 7:00 p.m., and she spoke to the security guard who was finishing the earlier shift . He told Brown that there were people walking through the parking lot, but he gave no indication that these people were dangerous or threatening. Shortly after Brown began her shift, someone called for security. As Brown began walking across the parking lot, she was shot twice.[1] Unfortunately, Brown sustained significant injuries as a result of the shooting. She filed a workers' compensation claim against Reel Security, and Reel Security's workers' compensation insurer ultimately paid out over $1 million to settle the claim.

In August 2021, Brown filed a premises liability action against the bowling alley, alleging that it was negligent in failing to keep the premises safe, failing to provide security, and failing to warn of criminal activity in the area, and that it had maintained a private nuisance. Because the bowling alley had transferred complete control and possession of the property to the filmmakers, the trial court granted Brown leave to

---

[1] The man who shot Brown was arrested on other charges and sentenced to life in prison for an unrelated murder.

amend the suit and add Swap Meat, Divide & Conquer, LLC, and Blumhouse

Productions, LLC, as defendants. Blumhouse is a production company based in Los

Angeles that makes horror films. For each film it produces, Blumhouse creates a

single-purpose entity to serve as the production company for that film, and Swap Meat

was formed as the corporate entity to produce the film Freaky. In turn, Swap Meat

contracted with Divide & Conquer to serve as a local producer "on the ground[.]"

In October 2021, Brown filed an amended complaint against Swap Meat, Divide

& Conquer, and Blumhouse (collectively, "the production companies"), asserting the

same claims for negligence and private nuisance that she had previously asserted

against the bowling alley. In June 2022, the production companies requested that Reel

Security provide insurance and indemnification pursuant to the Agreement to defend

against Brown's lawsuit. In response, Reel Security's insurer denied that it had any

obligation to defend or indemnify the production companies. Specifically, the insurer

stated that the Agreement:

> does not require Reel Security to defend anyone else for their own
> negligence, and Tomesha Brown has not alleged any negligence or
> misconduct by Reel Security. She has, however, included specific
> allegations of negligence on the part of Swap Meat Films, Divide &
> Conquer and Blumhouse Productions, including that they failed to keep

4

the premises safe, failed to provide a sufficient amount of security and failed to warn of the criminal activity in the area.

Consequently, Reel Security's insurer concluded that "there is no duty to defend under the terms of the contract." The insurer also stated that because there was no negligence by Reel Security, the production companies were not considered additional insureds under the policy issued to Reel Security. Thereafter, with the permission of the trial court, the production companies filed a third-party complaint against Reel Security for breach of the Agreement.

The production companies filed a motion for partial summary judgment against Reel Security as to liability, and Reel Security filed a cross-motion for summary judgment. In the meantime, Brown settled with the production companies, and the court dismissed her claims against them.

Following a hearing, the trial court entered an order finding that Reel Security had breached the Agreement by failing to indemnify Swap Meat; Reel Security had obtained insurance coverage as required by the Agreement; and Divide & Conquer and Blumhouse were not covered by the Agreement's indemnity provision. Accordingly, the trial court granted, in part, Swap Meat's motion for partial summary

judgment (as to indemnification); denied, in part, Swap Meat's motion for partial summary judgment (as to insurance coverage); granted Reel Security's motion for summary judgment as to Divide & Conquer and Blumhouse and ordered their names removed from the case style; and indicated that it would set the matter for a trial on damages. These appeals follow.

As an initial matter, we note that the Agreement provides that it should be governed by California law. As such, we will apply Georgia law as it relates to procedural matters, but California law with respect to substantive claims.[2] See, e.g., *Continental Ins. Co. v. Equity Residential Properties Trust*, 255 Ga. App. 445, 445 (565 SE2d 603) (2002) (explaining that contract's choice of law "does not control the procedural law applicable in the forum state" and "Georgia courts will apply Georgia law governing procedural or remedial matters").

*Case No. A25A0751*

1. In its appeal, Reel Security contends that the trial court erred in granting, in part, Swap Meat's motion for summary judgment as to liability because it has already paid Brown's workers' compensation claim. This argument is not compelling.

---

[2] For this reason, we do not address the parties' various arguments regarding Georgia law with respect to the substantive claims.

6

The trial court did not specifically rule on this issue. However, because the issue was raised below, this Court may affirm the grant of summary judgment if it is right for any reason. *Ga.-Pacific v. Fields*, 293 Ga. 499, 504 (2) (748 SE2d 407) (2013); see *City Of Gainesville v. Dodd*, 275 Ga. 834, 837 (573 SE2d 369) (2002) (explaining that "judicial economy is advanced" when in a de novo review, based on undisputed facts and the law, the appellate court considers "each ground raised in the trial courts").

As a general rule, workers' compensation is the "sole and exclusive remedy of the employee" against her employer. Cal. Lab. Code § 3602 (a); see *Angelotti v. Walt Disney Co.*, 192 Cal. App. 4th 1394, 1403 (2) (a) (121 Cal. Rptr. 3d 863) (2011) ("Workers' compensation provides the exclusive remedy against an employer for an injury sustained by an employee in the course of employment and compensable under the workers' compensation law [and] precludes a tort remedy against the employer if the conditions of compensation are present.") (citation omitted). And, as such, Brown could not seek further damages from Reel Security.

However, California law provides an exception to the general rule of an exclusive remedy: in an action by the employee, the employer, or both against a third

person, such as the production companies, that "results in judgment against such third person, or settlement by such third person, the employer shall have no liability to reimburse or hold such third person harmless on such judgment or settlement in absence of a written agreement so to do . . . ." Cal. Lab. Code § 3864.[3] The purpose of § 3864 is to "eliminate an employer's liability under an equitable or implied indemnity theory" and insulate the employer "from indemnity claims unless they are based on an express contract of indemnity[.]" *City of Oakland v. Delcon Assoc.*, 168 Cal. App. 3d 1126, 1128-1129 (214 Cal. Rptr. 734) (1985). Because the Agreement contains a written indemnity clause, this case falls under the exception provided by § 3864 to the general rule that workers' compensation provides an exclusive remedy. See, e.g., *Kaiser Engineers v. Grinnell Fire Protection Systems*, 173 Cal. App. 3d 1050,

---

[3] Cal. Lab. Code § 3864 also provides that the written agreement must be "executed prior to the injury." Here, the Agreement was executed on November 12, 2019, after Brown was shot. Although counsel for the insurer argued below that the Agreement had no application in this case as a result, Reel Security's general counsel conceded that the Agreement controlled. And Reel Security concedes on appeal that the Agreement "had a retroactive effective date of October 18, 2019." Moreover, Reel Security does not argue that § 3864 is inapplicable because the services contract was executed after Brown's injury. Accordingly, Reel Security has abandoned any claim to this effect. See Court of Appeals Rule 25 (d) (1) ("Any enumeration of error that is not supported in the brief by citation of authority or argument may be deemed abandoned.").

1054 (II) (219 Cal. Rptr. 626) (1985) ("Where an employer has expressly contracted with respect to the duty to indemnify, the extent of its duty must be determined from the contract.").

2. Reel Security next contends that the trial court erred in granting, in part, summary judgment to Swap Meat as to liability because Reel Security cannot be held liable for Swap Meat's negligence. Given the Agreement's broad indemnification clause, this argument is not persuasive.

(a) Under California law, parties to a contract "may define therein their duties toward one another in the event of a third[-]party claim against one or both arising out of their relationship." *Crawford v. Weather Shield Mfg.*, 44 Cal. 4th 541, 551 (187 P3d 424) (2008). Such terms may require one party to indemnify the other or be responsible for the other party's legal defense. Id. at 551.

An indemnification provision "is construed under the same rules as govern the interpretation of other contracts. Effect is to be given to the parties' mutual intent, as ascertained from the contract's language if it is clear and explicit. Unless the parties have indicated a special meaning, the contract's words are to be understood in their ordinary and popular sense." *Crawford*, 44 Cal. 4th at 552. Accord Cal. Civ. Code §§

1636 ("A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful."); 1638 ("The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity."); 1644 ("The words of a contract are to be understood in their ordinary and popular sense, rather than according to their strict legal meaning; unless used by the parties in a technical sense, or unless a special meaning is given to them by usage, in which case the latter must be followed.").

In drafting an indemnification clause, the parties have great freedom to allocate such responsibilities and they "may agree that the promisor's indemnity and/or defense obligations will apply only if the promisor was negligent, or, conversely, even if the promisor was not negligent." *Crawford*, 44 Cal. 4th at 551 (citations omitted). However, when one party "seeks, in a noninsurance agreement, to be indemnified for his or her own active negligence, or regardless of the indemnitor's fault—protections beyond those afforded by the doctrines of implied or equitable indemnity—language on the point must be particularly clear and explicit, and will be construed strictly against the indemnitee." Id. at 552.

Here, the Agreement's indemnification clause, § 13, provides:

(b) [Reel Security] shall indemnify and hold harmless [Swap Meat], its parent, subsidiary and affiliated companies and the agents, representatives and employees of each of them from or against any loss, damage, injury, judgment, liability, claim, lien or cause of action, including reasonable attorney's fees and/or costs, including, without limitation, for injury to person or property, or death of a person (collectively hereinafter "Claims") to the extent that such Claims arise out of or result from the performance of services under this Agreement by [Reel Security] or any personnel provided by [Reel Security] hereunder, or the negligence or willful misconduct of [Reel Security], its employees, contractors, representatives or agents, or a breach by [Reel Security] or any representation, warranty or any other provision of this Agreement.

(c) Subject to the preceding paragraphs and except to the extent [Reel Security] is obligated to indemnify hereunder, [Swap Meat] shall defend, indemnify, and hold harmless [Reel Security], its agents or employees from and against any and all Claims resulting from the negligence or willful misconduct of [Swap Meat], its agents, representatives, and employees in connection with this Agreement.

Thus, the indemnification clause contemplates several different scenarios: (1) a claim arising "out of or result[ing] from the performance of services under this Agreement by [Reel Security] or any personnel provided by [Reel Security]"; (2) a claim arising

11

"out of or result[ing] from . . . the negligence or willful misconduct of [Reel Security]"; and (3) except to the extent Reel Security is obligated to indemnify Swap Meat under § 13 (b), i.e., except to the extent that the claim arises out of the performance of services under the Agreement or from Reel Security's negligence, claims "resulting from the negligence or willful misconduct of [Swap Meat]."[4]

Even strictly construed against Swap Meat, and even if—as Brown alleges, Swap Meat was negligent—Swap Meat bargained for Reel Security to indemnify Swap Meat "without limitation" for any claim arising out of or resulting from the performance of services under the Agreement, i.e., the provision of on-set security services. Although Reel Security argues that Brown's claims did not arise out of or result from the performance of security services under the Agreement, this argument fails. The undisputed evidence shows that during Brown's shift, someone called out for security, and as she walked in the direction of the call, she was shot. Thus, Brown's claims arose out of the performance of services under the Agreement. See *Continental Heller Corp. v. Amtech Mech. Svcs.*, 53 Cal. App. 4th 500, 505 (I) (B) (61

---

[4] To the extent that Reel Security argues that § 13 (c) requires Swap Meat to indemnify Reel Security, no third party has filed suit against Reel Security for injury to person or property.

Cal. Rptr. 2d 668) (1997) (holding that where contract required subcontractor to indemnify general contractor for loss that "arises out of or is in any way connected with the performance of work under" subcontract, and act that resulted in injury was connected with the performance of the work, general contractor was entitled to indemnification). Cf. *Melendrez v. Ameron Intl. Corp.*, 240 Cal. App. 4th 632, 639 (I) (193 Cal. Rptr. 3d 23) (2015) (Under workers' compensation principles, "[i]t has long been settled that for an injury to 'arise out of the employment' it must occur by reason of a condition or incident of the employment. That is, the employment and the injury must be linked in some causal fashion.") (citation and punctuation omitted).

(b) Reel Security nevertheless argues that it cannot be required to indemnify Swap Meat for Swap Meat's alleged negligence in this case because the allegations against Swap Meat could constitute active negligence and this is a question of fact for the jury.

Once again, the trial court did not specifically rule on this issue. Nevertheless, because the facts and law are undisputed, this Court exercises its discretion to consider if the trial court's grant of summary judgment is right for any reason. See, e.g., *Fields*, 293 Ga. at 504 (2); *Dodd*, 275 Ga. at 837.

Pursuant to California law, "[i]f an indemnity clause does not address itself to the issue of an indemnitee's negligence, it is referred to as a 'general' indemnity clause." *Rossmoor Sanitation v. Pylon, Inc.*, 13 Cal. 3d 622, 628 (I) (532 P2d 97) (1975). Importantly, while "such clauses may be construed to provide indemnity for a loss resulting in part from an indemnitee's *passive* negligence, they will not be interpreted to provide indemnity if an indemnitee has been *actively* negligent." Id. at 628 (I) (emphasis in original). "Whether conduct constitutes active or passive negligence depends upon the circumstances of a given case and is ordinarily a question for the trier of fact[.]" Id. at 629 (I).

> Passive negligence is found in mere nonfeasance, such as the failure to discover a dangerous condition or to perform a duty imposed by law. Active negligence, on the other hand, is found if an indemnitee has personally participated in an affirmative act of negligence, was connected with negligent acts or omissions by knowledge or acquiescence, or has failed to perform a precise duty which the indemnitee had agreed to perform.

*Rossmoor Sanitation*, 13 Cal. 3d at 629 (I) (citations omitted). Stated another way, "[t]he crux of the inquiry is to determine whether there is participation in some manner by the person seeking indemnity in the conduct or omission which caused the

14

injury beyond the mere failure to perform a duty imposed upon him by law." *Morgan v. Stubblefield*, 6 Cal. 3d 606, 625 (493 P2d 465) (1972). However, California courts have cautioned that "the active-passive rubric ought not to be wholly dispositive, but . . . instead the enforceability of an indemnity agreement shall primarily turn upon a reasonable interpretation of the intent of the parties." *Hernandez v. Badger Constr. Equip.*, 28 Cal. App. 4th 1791, 1821 (IV) (C) (3) (34 Cal. Rptr. 2d 732) (1994) (citation and punctuation omitted).

Applying these general principles to the facts of this case, there is simply no evidence that Swap Meat actively participated in the shooting of Brown. Brown alleges that Swap Meat failed to learn about prior criminal activity at the bowling alley, failed to keep the premises safe, failed to provide adequate security measures, failed to warn of criminal activity, and failed to remedy a dangerous environment. But the evidence was undisputed that the owner of the bowling alley did not tell Swap Meat about any crimes that had occurred on the property; Swap Meat had "no knowledge whatsoever" regarding any criminal activity there; and it would be "atypical" for a production company to research the crime history of a set location or request any information from police. There was also evidence that typically only one guard is on

set before filming begins (as was the case here), security guards on set are usually unarmed, and that the most common incidents on set involve theft of equipment. Because mere nonfeasance, "such as a negligent failure to discover a dangerous condition arising from the work[,] will not preclude indemnity under a general clause," the trial court did not err in granting summary judgment to Swap Meat as to liability. *Markley v. Beagle*, 66 Cal. 2d 951, 962 (429 P2d 129) (1967).

3. Finally, Reel Security contends that the trial court's interpretation of the Agreement creates a "two-party exculpatory clause." However, Reel Security failed to raise this argument in the trial court. Accordingly, this claim is not properly before this Court. See generally *Pfeiffer v. Ga. Dept. of Transp.*, 275 Ga. 827, 829 (2) (573 SE2d 389) (2002) ("[O]ur appellate courts are courts for the correction of errors of law committed in the trial court [and] absent special circumstances, an appellate court need not consider arguments raised for the first time on appeal.") (footnotes omitted). But even if this claim was properly before this Court, this case concerns a dispute over an indemnification clause, as the underlying claims are those of Brown, a third party. See *Queen Villas Homeowners Assn. v. TCB Property Mgmt.*, 149 Cal. App. 4th 1, 5 (II) (56 Cal. Rptr. 3d 528) (2007) (distinguishing between an indemnification agreement,

16

which ordinarily relates to third-party claims, and a two-party exculpatory clause "where one party asserts that a contract purportedly releases it of all liability to the other").

*Case No. A25A0752*

4. Turning to the production companies' appeal, they contend that the trial court erred in denying, in part, their motion for partial summary judgment because Reel Security did not procure liability coverage as required by the contract. We disagree.

As relevant here, the Agreement's insurance clause, also contained in § 13, provides:

> (a) [Reel Security] represents and warrants that at the time this Agreement is entered into and throughout the entire time that [Reel Security] provides services hereunder, it carries and shall carry 1) Worker[s'] Compensation insurance to the extent required by law, and Employer's Liability insurance in the amount of not less than $1,000,000 per accident; 2) commercial general liability insurance, including errors and omissions coverage, in an amount not less than $5,000,000 per occurrence; and 3) Comprehensive Automobile Liability, including coverage for all owned, leased, hired and non-owned automobiles, with a combined single limit for Bodily Injury and Property Damage of $1,000,000 per occurrence. The certificate of insurance shall name

[Swap Meat] as an additional insured on the general and automobile liability policies. Coverage shall be considered primary and not excess of or contributory to any other insurance afforded by [Swap Meat.]

The certificate of liability insurance provided by Reel Security indicates that it had obtained commercial general liability insurance in the amount of $5 million (as well as the required workers' compensation and auto policies) and that Swap Meat was an additional insured under the general liability policy "with respect to the liability created by the negligent acts, errors and omissions of [Reel Security] as required by written contract."[5] Thus, the undisputed evidence shows that Reel Security procured insurance as required by § 13 (a) of the Agreement. Although Reel Security's insurer subsequently refused to cover Brown's claims against the production companies, that does not alter the fact that Reel Security obtained the insurance as required. As the production companies concede, "[t]his is not an insurance coverage dispute. Whether Reel Security's insurer correctly or wrongfully interpreted its liability policy is not at issue and [is] irrelevant." Accordingly, the trial court's ruling on this issue is affirmed.

---

[5] None of the insurance policies are included in the record on appeal.

18

5. Finally, the production companies contend that the trial court erred in granting summary judgment to Reel Security and denying summary judgment to Divide & Conquer and Blumhouse on the basis that these entities were not covered by § 13 (b) of the Agreement. We agree.

Under California law, "[t]he whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable[.]" Cal. Civ. Code § 1641. And, as relevant to this claim, the Agreement's indemnification provision provides that Reel Security "shall" indemnify and hold harmless not only Swap Meat, but also Swap Meat's "parent, subsidiary and affiliated companies and the agents, representatives and employees of each of them from or against any loss. . . ." The Agreement additionally provides:

> Nothing in this Agreement is intended to confer any rights or remedies on anyone other than the Parties hereto and their respective successors, representatives and assigns. The provisions of this Agreement shall not entitle any person not a signatory to this Agreement to any rights as a third[-]party beneficiary, or otherwise, it being the specific intention of the Parties hereto to preclude any and all-non-signatory Parties from any such third[-]party beneficiary rights, or any other rights whatsoever. Notwithstanding the foregoing, [Swap Meat] shall have the right to

19

assign this Agreement to its parent, subsidiary or affiliated companies.

Thus, the Agreement explicitly contemplates that Reel Security shall also indemnify and hold harmless Swap Meat's parent companies, subsidiaries, and affiliated companies, and, notwithstanding the general provision according no rights under the Agreement to any third parties, Swap Meat could assign the Agreement to "its parent, subsidiary or affiliated companies." Accordingly, to the extent that Blumhouse and Divide & Conquer constitute parent, subsidiary, or affiliated companies of Swap Meat, they would be entitled to indemnification under the Agreement. See Cal. Civ. Code § 1638 (providing that the language of a contract governs its interpretation).

(a) The undisputed evidence shows that Blumhouse is a parent company of Swap Meat. As such, the Agreement required Reel Security to indemnify and hold harmless Blumhouse. See *Kaiser Engineers*, 173 Cal. App. 3d at 1055 (II) (explaining that "the third person need not be named or identified individually to be an express beneficiary" of a contract and "may enforce a contract if it can be shown that he or she is a member of the class for whose express benefit the contract was made").

20

Accordingly, the trial court erred in ruling that Blumhouse was not entitled to indemnification and in granting summary judgment to Reel Security on this issue.

(b) The evidence as to Divide & Conquer is more complicated.

As an initial matter, there is no evidence that Divide & Conquer is a parent company or subsidiary of Swap Meat. Thus, Divide & Conquer will only be entitled to indemnification if it is an affiliated company of Swap Meat. An affiliated company refers to "a relationship that is closer than a mere arm's length contractual relationship." *Grande v. Eisenhower Med. Center*, 44 Cal. App. 5th 1147, 1165 (II) (B) (258 Cal. Rptr. 3d 324) (2020), aff'd, 13 Cal. 5th 313 (512 P3d 73) (2022). See *Iqbal v. Ziadeh*, 10 Cal. App. 5th 1, 10 (II) (215 Cal. Rptr. 3d 684) (2017) (collecting sources indicating that "the common meaning of an affiliate generally is one who is dependent upon, subordinate to, an agent of, or part of a larger or more established organization or group"); Black's Law Dictionary (12th ed. 2024) (defining "affiliate" as "[a] corporation that is related to another corporation by shareholdings or other means of control; a subsidiary, parent, or sibling corporation").

Here, Divide & Conquer contracted with Swap Meat to serve as a local producer. Divide & Conquer worked closely with Blumhouse during the production,

and its services were to be "under the direction, supervision and control" of Swap Meat.[6] Viewing this evidence in the light most favorable to the production companies, as we must, there is evidence sufficient to, at the very least, create a genuine issue of material fact as to whether Divide & Conquer is an affiliated company of Swap Meat within the meaning of § 13 (b) because it was under Swap Meat's supervision and control. See *Iqbal*, 10 Cal. App. 5th at 10 (II) (holding that where parties' contractual relationship did not make "defendant dependent upon, under the control of, an agent of, or a part of" of other party, defendant was not an affiliate). Thus, Reel Security, as the movant, has not met its burden of showing that it is entitled to summary judgment as a matter of law as to this issue. Accordingly, we reverse the trial court's grant of summary judgment to Reel Security on the issue of whether Divide & Conquer was entitled to indemnification under the Agreement.

---

[6] We note that the owner of Divide & Conquer, Adam Hendricks, was deposed as a representative of Swap Meat. We make no ruling on whether Hendricks's role in this regard required Reel Security to indemnify Divide & Conquer under the Agreement.

We do not authorize the reporting of this opinion. See Court of Appeals Rules 33.2 (b), 34.

*Judgment affirmed in A25A0751. Judgment affirmed in part and reversed in part in A25A0752. Dillard, P. J., and Mercier, J., concur.*